UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY; ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY; and ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY, | C.A. No. _____ |
| Plaintiffs, | |
| v. | |
| LINT CHIROPRACTIC PC; MI MEDICAL MANAGEMENT, LLC; DURAMED MI, LLC; SUPPLIES PLUS MI, LLC; DIAGNOSTIC CHIROPRACTIC MI, P.C.; EXCEL MEDICAL GROUP, PLC; AS MEDICAL GROUP, PLC; and ROBERT SUPER, D.C., | **Demand for Jury Trial** |
| Defendants. | |

## COMPLAINT

Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company (collectively, "Allstate" and/or "plaintiffs") hereby allege as follows.

## I.      INTRODUCTION

1.      This is a case about medical clinics, chiropractic clinics, durable medical equipment ("DME") issuers, and their owners, managers, agents, and

1

representatives who abused the medical benefits available under the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., by engaging in a scheme to defraud Allstate by submitting and causing to be submitted false and fraudulent medical records, bills, and invoices through interstate wires and the U.S. Mail seeking to collect payment from Allstate for treatment and services that were not actually performed, were medically unnecessary, were fraudulently billed, and were not lawfully rendered pursuant to applicable statutes and regulations, including the Michigan No-Fault Act.

2.      Defendants Lint Chiropractic PC ("Lint"), MI Medical Management, LLC ("MI Medical"), Duramed MI, LLC ("Duramed"), Supplies Plus MI, LLC ("Supplies Plus"), Diagnostic Chiropractic MI, P.C. ("Diagnostic Chiropractic"), Excel Medical Group, PLC ("Excel"), AS Medical Group, PLC ("AS Medical"), and Robert Super, D.C. ("Super") (collectively, the "defendants") each conspired to, and did in fact, defraud Allstate by perpetuating an insurance fraud scheme in violation of federal and state law.

3.      The insurance fraud scheme perpetrated by the defendants was designed to, and did in fact, result in payments from Allstate to and on behalf of the defendants pursuant to Michigan's No-Fault Act.

4.      All of the acts and omissions of the defendants, described throughout this Complaint, were undertaken intentionally.

2

5.     By this Complaint, and as detailed in each count set out below, Allstate seeks damages under causes of action for: (1) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c) and (d); (2) common law fraud; (3) civil conspiracy; (4) payment under mistake of fact; and (5) unjust enrichment.  Allstate also seeks declaratory relief that no previously-denied and pending insurance claims submitted to it by the defendants are compensable.

## II.     THE PARTIES

### A.     PLAINTIFFS

6.     Allstate Insurance Company, Allstate Property and Casualty Insurance Company, and Allstate Fire and Casualty Insurance Company are each companies duly organized and existing under the laws of the State of Illinois.

7.     Allstate Insurance Company, Allstate Property and Casualty Insurance Company, and Allstate Fire and Casualty Insurance Company each have their respective principal places of business in Northbrook, Illinois.

8.     At all times relevant to the allegations contained in this Complaint, the plaintiffs were authorized to conduct business in the State of Michigan.

### B.     DEFENDANTS

#### 1.     Lint Chiropractic PC

9.     Defendant Lint Chiropractic PC is a professional corporation incorporated under the laws of the State of Michigan.

3

10.     Lint's principal place of business is in Southfield, Michigan.

11.     At all relevant times, Lint was operated and conducted by defendants MI Medical, Duramed, Supplies Plus, Diagnostic Chiropractic, Excel, AS Medical, and Super.

12.     Lint billed Allstate for services not rendered, that were medically unnecessary (to the extent they were rendered at all), and that were unlawful in relation to several Allstate insureds, including the patients identified in Exhibit 1.

## 2.     **MI Medical Management, LLC**

13.     Defendant MI Medical Management, LLC is a limited liability company organized under the laws of the State of Michigan.

14.     MI Medical's member is defendant Super, who is a citizen of the State of Florida.

15.     At all relevant times, MI Medical was operated and conducted by defendants Lint, Diagnostic Chiropractic, and Super.

16.     MI Medical billed Allstate for services not rendered, that were medically unnecessary (to the extent they were rendered at all), and that were unlawful in relation to several Allstate insureds, including the patients identified in Exhibit 2.

### 3.     Duramed MI, LLC

17.     Defendant Duramed MI, LLC is a limited liability company organized under the laws of the State of Nevada.

18.     Duramed is a wholly-owned subsidiary of Can B. Corp., which was incorporated in the State of Florida and has a principal place of business in the State of New York.

19.     At all relevant times, Duramed was operated and conducted by defendants Lint, Diagnostic Chiropractic, and Super.

20.     Duramed billed Allstate for services not rendered, that were medically unnecessary (to the extent they were rendered at all), and that were unlawful in relation to several Allstate insureds, including the patients identified in Exhibit 3.

### 4.     Supplies Plus MI, LLC

21.     Defendant Supplies Plus MI, LLC is a limited liability company organized under the laws of the State of Michigan.

22.     Supplies Plus's member is Super, who is a citizen of the State of Florida.

23.     At all relevant times, Supplies Plus was operated and conducted by defendants Lint, Diagnostic Chiropractic, and Super.

24.     Supplies Plus billed Allstate for services that were medically unnecessary (to the extent they were rendered at all) and that were unlawful in relation to several Allstate insureds, including the patients identified in Exhibit 4.

### 5.     Diagnostic Chiropractic MI, P.C.

25.     Defendant Diagnostic Chiropractic MI, P.C. is a professional corporation incorporated under the laws of the State of Michigan.

26.     Diagnostic Chiropractic's principal place of business is in Bloomfield Hills, Michigan.

27.     At all relevant times, Diagnostic Chiropractic was operated and conducted by defendants Lint and Super.

28.     Diagnostic Chiropractic billed Allstate for services not rendered, that were medically unnecessary (to the extent they were rendered at all), and that were unlawful in relation to several Allstate insureds, including the patients identified in Exhibit 5.

### 6.     Excel Medical Group, PLC

29.     Defendant Excel Medical Group, PLC is a professional limited liability corporation incorporated under the laws of the State of Michigan.

30.     Excel's members are Pierre Rojas, D.O. and Steven Petrovas, M.D., who are both citizens of the State of Michigan.

31.     At all relevant times, Excel was operated and conducted by defendants Lint, AS Medical, and Super.

32.     Excel billed Allstate for services not rendered, that were medically unnecessary (to the extent they were rendered at all), and that were unlawful in relation to several Allstate insureds, including the patients identified in Exhibit 6.

### 7.     **AS Medical Group, PLC**

33.     Defendant AS Medical Group, PLC is a professional limited liability corporation incorporated under the laws of the State of Michigan.

34.     AS Medical's member is Ali Shukr, M.D., who is a citizen of the State of Michigan.

35.     At all relevant times, AS Medical was operated and conducted by defendants Lint, Excel, and Super.

36.     AS Medical billed Allstate for services that were medically unnecessary (to the extent they were rendered at all) and that were unlawful in relation to several Allstate insureds, including the patients identified in Exhibit 7.

### 8.     **Robert Super, D.C.**

37.     Defendant Super is a resident and citizen of the State of Florida.

38.     At all relevant times, Super operated and controlled defendants Lint, MI Medical, Duramed, Supplies Plus, Diagnostic Chiropractic, Excel, and AS Medical.

7

III.   **JURISDICTION AND VENUE**

39.    Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over this action relating to the claims brought by the plaintiffs under 18 U.S.C. § 1961, *et seq.* because they arise under the laws of the United States.

40.    Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this action because the amount in controversy, exclusive of interest and costs, exceeds $75,000 against each defendant and because it is between citizens of different states.

41.    Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

42.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the vast majority of the acts at issue in this Complaint were carried out within the Eastern District of Michigan.

IV.   **BACKGROUND ON THE DEFENDANTS AND THEIR SCHEME TO DEFRAUD**

43.    The scheme described by this Complaint was driven by chiropractors who primarily practice in New York and Florida and who set up businesses in Michigan in order to take advantage of the insurance benefits available under the Michigan No-Fault Act.

44.    The defendants developed a scheme through which they believed they could continue to demand unlimited and uncapped benefits from insurers like Allstate despite the No-Fault Act's implementation of a statutory fee schedule by

8

billing almost exclusively for purported services that are not covered by the No-Fault Act's fee schedule because they are experimental, unproven, and unnecessary.

45.    Defendant Super used defendants Lint, MI Medical, Excel, and AS Medical to bill for purported trigger point impedance imaging ("TPII") and localized intense neurostimulation therapy ("LINT").

46.    These purported treatments consisted of nothing more than purporting to identify and attempting to relieve trigger points through electrical stimulation, which are the same services typically billed by physicians, chiropractors, and physical therapists for a small fraction of the amount billed by the defendants, and which services would have been subject to the No-Fault Act's fee schedule if billed as such.

47.    Purported TPII and LINT services were allegedly done using equipment called Nervomatrix machines, which Super and Lint owned, leased, and otherwise controlled in Michigan.

48.    Indeed, defendant Super has sworn via affidavit that he had an exclusive contract that entitled him to "dominion and control" over all Nervomatrix machines in the United States.

49.    Super has reported that he leased Nervomatrix machines from Tech Biz Solutions MI, Inc., which is owned by Alex Buziashvili ("Buziashvili").

50.   Buziashvili has a significant history of fraud that has led to an indictment and multiple fraud lawsuits filed by insurers in New York, including in relation to billing for services allegedly done using Nervomatrix machines.

51.   Nervomatrix machines were approved for use by the Food and Drug Administration ("FDA") as a transcutaneous electrical nerve stimulation ("TENS") device.

52.   The defendants routinely submitted copies of correspondence from the FDA approving the marketing of Nervomatrix machines, but intentionally omitted the portions of the correspondence characterizing the machines as TENS devices because  TENS treatment and devices are routine procedures that are covered by the No-Fault Act's fee schedule and paid at a tiny fraction of the amount billed by the defendants.

53.   Defendants Super and Lint installed Nervomatrix machines at an office set up by Lint in Michigan and at offices of several different physicians, chiropractors, and physical therapy providers in Michigan, and defendants Lint, MI Medical, Excel, and AS Medical billed for the purported TPII and LINT services rendered using the Nervomatrix machines.

54.   Several practitioners were claimed to have performed purported TPII and LINT services on behalf of several of the defendant clinics, including a

physician named Mark Kalloway, M.D., who was claimed to render services for both Excel and AS Medical.

55.     On each date the defendants claimed to render TPII and LINT services, they charged at least $3,990 and as much as $6,137 for these experimental and unproven procedures.

56.     Defendants Lint, Super, and their associates also prescribed medically unnecessary DME as a matter of course that was billed by defendants Duramed and Supplies Plus and was also designed to avoid the No-Fault Act's fee schedule.

57.     Duramed billed $1,530 every six (6) days for the purported rental of sustained acoustic medicine ("SAM") devices that are unproven, unnecessary, and misused, if they were actually issued to patients at all.

58.     Duramed's SAM devices are approved for prescription use only, and Duramed fabricated prescription slips to create the appearance that they had been ordered by physicians when they were not.

59.     Duramed disclosed in filings with the Securities and Exchange Commission ("SEC") that it purchases its SAM devices for $2,447, but its bills to Allstate often neared $25,000 for purported rentals for patients at issue herein.

60.     Defendant Supplies Plus billed $600 per day for alleged rental of cold compression devices.

61.    Like Duramed, Supplies Plus fabricated prescriptions and issued medically unnecessary DME that was misused, if it was given to patients at all.

62.    The defendants used Diagnostic Chiropractic to bill for purported range of motion ("ROM") and muscle testing, both of which are standard components of evaluations that were already performed by other providers on the patients at issue and which were never proper to bill as standalone procedures, much less at the exorbitant rates billed by the defendants.

63.    Defendant Super and his associates, including Richard Gellar ("Gellar"), who claims to be "general council" [sic] of several of the defendants, including Lint, MI Medical, and Diagnostic Chiropractic, and who mailed correspondence, bills, and records demanding payment to Allstate for services described herein, also own and control separate companies that promote the use of the services described herein to generate additional revenue and purchase the rights to collect from insurers for services allegedly performed by other clinics.

64.    Among the companies owned and controlled by Super and his associates for this purpose is Medical Capital Solutions, LLC ("MCS"), which advertises inside of clinics that purport to render TPII and LINT services:



65.     Thus, defendant Super and his associates monetized the unnecessary alleged provision of TPII and LINT services through at least three (3) methods: (1) renting Nervomatrix machines to other providers; (2) directly billing Allstate for TPII and LINT through entities controlled by Super; and (3) purchasing accounts receivable for alleged TPII and LINT services from other providers for a fraction of the amount billed to insurers.

66.     The defendants also monetized their bills to Allstate and funded their continuing scheme by selling accounts receivable to third parties, including entities called Funding 4 Doctors, LLC, Genesis Alternative Finance IV, LLC, and Genesis Alternative Finance V, LLC.

67.     The Genesis Alternative Finance entities purchased the defendants' accounts receivable for just 25% of the amount billed to insurers.

68.     The defendants intentionally installed their Nervomatrix machines in clinics that have a lengthy history of abuse of Michigan's No-Fault system.

69.     For example, Super leased several Nervomatrix machines to physical therapy clinics owned and controlled by Norman Dehko and his family, including Level One Health Systems of Michigan, LLC ("Level One"), Michigan First Rehab, LLC ("Michigan First"), and Therapy Professionals, LLC ("Therapeutic Professionals").

70.     In 2007, Norman Dehko, along with his mother, Latifa Dehko, and his brother, Dickow Dehko, was arrested and charged with insurance fraud in connection with a scheme that involved falsification of reports and enhancing collision damage.

71.     Norman Dehko, who was described as the ringleader of the scheme, was charged with forty (40) felonies, and was alleged to have used as many as twelve (12) separate auto body shops to perpetrate the fraud.

72.     In 2012, Norman Dehko pleaded guilty to insurance fraud conspiracy.

73.     Norman Dehko has also been implicated in a scheme in which a former Detroit police officer was convicted of misconduct in office for, *inter alia*, creating falsified police reports for Norman Dehko and others.  *See* State of Michigan v. Schuh, No. 08-013141-FH, Wayne Circuit Court.

74.   The convicted officer admitted that he had received between five and seven thousand dollars in "loans" from collision shop owners that had no payback arrangement, and that were not in fact paid back.

75.   Norman Dehko, who is a layperson, has continued to direct purported treatment of patients who claim to have been in motor vehicle accidents by identifying such patients through his family's auto body shops and directing them to clinics owned by himself and his family members, including the clinics listed above at which the defendants installed Nervomatrix machines.

76.   Nervomatrix machines were also installed by the defendants at Revival Physical Therapy LLC ("Revival"), which is owned and managed by Joseph Awada.

77.   Joseph Awada maintains an extensive patient solicitation network through which patients are compensated for presenting to physical therapy clinics owned by himself and his family members for treatment that is medically unnecessary (to the extent treatment is rendered at all).

78.   Lint's association with Awada and Revival was so close that Lint submitted insurance claims to Allstate documenting that services were performed by an apparent combined entity called "Lint-Revival PT."

79.   Another Nervomatrix machine was installed at the office of a clinic called Therapy Professionals, LLC, which is owned by a physical therapist named Ashfaq Ahmed ("Ahmed").

80.     Ahmed previously pleaded guilty and was sentenced to twenty-one (21) months in federal prison for perpetrating a scheme in which he paid chiropractors a 30% kickback on bills generated by his office in exchange for patient referrals, which is remarkably similar to the scheme described herein wherein chiropractors (like defendant Super) monetized referrals of patients to offices at which Nervomatrix machines were installed.

81.     In order to generate bills and other documents that would induce insurers to pay for their unproven and unnecessary services, the defendants hired a biller named Candice Kayal ("Kayal"), who has claimed to Allstate to be the manager of Lint.

82.     Indeed, Kayal claimed to Allstate that she supervised Lint chiropractor Cory Borawski, D.C. ("Borawski"), which is an improper arrangement of layperson supervision of alleged medical services.

83.     Kayal prepared, faxed, and mailed bills to Allstate for services purportedly rendered by Lint, MI Medical, Duramed, Supplies Plus, and Diagnostic Chiro, further confirming that these entities worked in conjunction with one another to obtain payment from insurers.

84.     Super and Gellar's Medical Capital Solutions also used Kayal's office to conduct its business of acquiring the rights to medical bills for the unnecessary and unlawful services described herein.

16

85.     These records and bills that were prepared, faxed, and mailed on behalf of the defendant entities confirm that the defendants intended to specifically target uncapped and non-fee-scheduled purported treatments by emphasizing that bills were for services not covered by the No-Fault fee schedule and that they would not accept reductions in payment amounts.

86.     As a result of these relationships and associations, the defendants had a significant financial motivation to bill Allstate as much as possible, all at unconscionable rates and regardless of medical need and applicable standards of care.

87.     The defendants' bills and associated records were sent to Allstate through faxes over interstate wires and the U.S. Mail, and Allstate relied on the faxes and mailings sent by the defendants in adjusting and paying insurance claims.

## V.     BILLING FOR SERVICES NOT RENDERED

88.     The defendants regularly submitted bills to Allstate seeking payment for treatment and services that were never rendered to patients at issue herein.

89.     Purchasers of the defendants' accounts receivable Genesis Alternative Finance IV, LLC and Genesis Alternative Finance V, LLC, who have far greater access to the defendants' business records than Allstate, have also alleged in pleadings in separate litigation that they discovered that the defendants billed for services that were not performed at all.

90.     The defendants' pervasive pattern of faxing and mailing demands for payment for services that were not rendered is indicative of their goal to submit as many bills for payment as possible regardless of whether the treatment was actually rendered and whether it was medically necessary (discussed in detail *infra*).

91.     All of the bills submitted by the defendants to Allstate through interstate wires and the U.S. Mail seeking payment for treatment that never occurred are fraudulent.

92.     Allstate is not required to pay the defendants for services that were never provided to patients at issue in this Complaint and is entitled to recover any payments tendered to the defendants as a result of their fraudulent billing for services not rendered.

### A.    BILLING FOR TPII AND LINT TREATMENT NOT PROVIDED

93.     According to a complaint filed by Lint in February 2022, Super set up Nervomatrix machines at three (3) clinic locations owned and controlled by Norman Dehko and his associates in May of 2021.

94.     Sabah Dehko (Norman Dehko's son and the purported owner and manager of at least one of the clinic locations) swore via affidavit that there was no communication between the Norman Dehko parties and Super from July 2021 through January 2022.

95.     Sabah Dehko further swore that Lint and its representatives made no effort to pick up the Nervomatrix machines from the three (3) facilities and he considered the machines abandoned.

96.     Despite having no contact with the Dehko facilities for months, Lint continued to bill for alleged services performed at the Dehko's facilities.

97.     For example, Lint billed Allstate for allegedly performing TPII and LINT services with a Nervomatrix machine to G.J. (Claim No. 0626158497)[1] at Level One on five (5) dates of service from November 5, 2021 through December 30, 2021.

98.     It is not possible that Super, or any Lint representative, was on site and treating patients for a period of over two (2) months during which Sabah Dehko reported there was no contact and he believed that the Nervomatrix machines were abandoned.

99.     Similarly, Lint sued Allstate seeking payment for services allegedly performed to patient K.B. at Michigan First from March 3, 2021 through June 25, 2021.

---

[1] To protect the confidentiality of the patients at issue herein, Allstate refers to them by initials and Allstate claim number.  As the defendants only submit bills to Allstate using the Allstate claim number, they are aware of these patients and can identify them by the information provided herein.

100.   As noted above, Lint did not have machines set up at Michigan First until May of 2021 and therefore these and all other services billed before May 1, 2021 at that clinic location could not have been performed.

101.   The defendants also billed for services that were not performed at all at their own facilities.

102.   For example, defendant Excel billed for alleged TPII and LINT services to C.S. (Claim No. 0615314374) on March 17, 2022 despite also submitting a record stating that C.S. could not tolerate the treatment and it was not performed.

103.   Super has also testified that LINT treatment can only be provided if the TPII scan identifies ten (10) trigger points for treatment.

104.   Super testified that if the machine is only able to identify three (3) trigger points, "it won't go. You can't treat it. You have to find ten clinically relevant trigger points."

105.   The defendants routinely billed Allstate for TPII and LINT treatment allegedly provided with less than ten (10) treatment points.

106.   For example, MI Medical billed Allstate for alleged LINT treatment to N.J. (Claim No. 0619748709) on several dates despite identifying far fewer than ten (10) treatment points and, on most dates, despite identifying no treatment points at all.

107.   On March 3, 2022, MI Medical billed for purported TPII and LINT treatment allegedly administered to N.J. at the office of a chiropractic clinic called Forbes Health Solutions, PLLC d/b/a iCare Spine & Rehab ("iCare"), but the record generated by the Nervomatrix machine documents that just one (1) treatment point was located.

108.   MI Medical nevertheless billed for purported LINT treatment that could not have been performed due to a lack of identified points to render treatment on the patient.

109.   A separate record for the same alleged date of service was submitted to Allstate claiming that the service had been performed by defendant Lint rather than defendant MI Medical.

110.   Moreover, the iCare treatment record for the same date, which otherwise detailed several evaluations and modalities of treatment, is silent as to the performance of any TPII or LINT.

111.   Then, on at least seven (7) subsequent dates – March 15, 17, and 31 and April 5, 7, 14, and 19, 2022 – MI Medical billed for purported LINT treatment to N.J. despite failing to identify a single potential treatment point.

112.   The charts generated by the Nervomatrix machine confirm that LINT was not actually rendered to N.J. as it contains "0" in the columns that would have

had different values to measure the intensity of purported treatment had any occurred.

113.   Defendant AS Medical also billed for purported LINT treatment that was not and could not have been performed due to a failure to identify a sufficient number of treatment points, including on October 7, 2021 to E.A. (Claim No. 0592475669) when the Nervomatrix machine only identified nine (9) potential treatment points.

114.   Moreover, the AS Medical office note for the same date indicates that E.A. would be shown a video about TPII and LINT at her next appointment and would at that time make a decision about whether to go ahead with the treatment.

115.   E.A. never returned to AS Medical or to any other provider after that date.

116.   Similarly, defendants AS Medical and Lint each billed for purported TPII and LINT on multiple dates to G.C. (Claim No. 0549042489) even though they did not identify a sufficient number of potential treatment points for the Nervomatrix machines to proceed with treatment.

117.   AS Medical billed for LINT not performed to G.C. on April 29, 2021 (four (4) potential treatment points); May 4, 2021 (two (2) potential treatment points); May 19, 2021 (two (2) potential treatment points); May 26, 2021 (five (5) potential treatment points); May 27, 2021 (four (4) potential treatment points);

August 4, 2021 (zero (0) potential treatment points); August 10, 2021 (zero (0) potential treatment points); August 16, 2021 (five (5) potential treatment points); and August 19, 2021 (two (2) potential treatment points).

118.   Lint billed for alleged LINT not performed to G.C. on July 28, 2021 (eight (8) potential treatment points).

119.   On several dates, AS Medical claimed to have performed TPII and LINT to G.C.'s thoracic spine despite the record generated by the Nervomatrix machine claiming that the attempt to find treatment points and treatment (if rendered at all) was to G.C.'s lumbar spine.

120.   Further, on June 14, 2021, AS Medical reported that G.C. had undergone three (3) prior treatments with a Nervomatrix machine but AS Medical and Lint had collectively billed for such alleged treatment on at least nine (9) separate occasions prior to that date.

121.   On August 16, 2021, AS Medical reported that G.C. had undergone his final Nervomatrix treatment on that date, but just three (3) days later on August 19, 2021, AS Medical billed for additional TPII and LINT, which, as noted above, also could not have been performed due to failure to identify sufficient potential treatment points.

### B.   BILLING FOR ROM AND MUSCLE TESTING NOT PERFORMED

122.   Diagnostic Chiropractic routinely billed for ROM testing at excessive rates that was not performed as billed.

123.   Diagnostic Chiropractic billed for this unnecessary and redundant ROM testing using Current Procedural Terminology ("CPT")[2] code 95851, which describes testing performed to "each extremity or trunk section," and not to individual tests or movements to a body part or region.

124.   Indeed, it is required that tests be performed on an entire extremity or trunk section in order to bill for just one unit of CPT code 95981.

125.   The federal government has explained that to use CPT code 95851 "for extremity ROM testing, every joint of an extremity would need to be tested, with documentation of why such a thorough assessment was warranted. It would not be appropriate to bill code 95851 if only shoulder ROM needed to be tested."

126.   As detailed below, the defendants never provided any explanation as to why redundant and standalone ROM testing was warranted.

---

[2] CPT codes are published annually by the American Medical Association ("AMA") to facilitate the efficient processing of healthcare charges by insurance carriers and other private and governmental healthcare payors.  Providers who are subject to the Health Insurance Portability and Accountability Act ("HIPAA") are required to use CPT codes.

127.   Diagnostic Chiropractic also improperly billed separate units of CPT code 95981 for each individual test allegedly performed to the patients at issue herein.

128.   For example, Diagnostic Chiropractic billed Allstate for thirty-four (34) units of ROM testing using CPT code 95851 on October 12, 2021 to T.K. (Claim No. 0644145962).

129.   ROM testing was billed for T.K.'s cervical spine, lumbar spine, bilateral shoulders, and bilateral hips.

130.   The only upper extremity joints Diagnostic Chiropractic allegedly tested were T.K.'s shoulder.  Thus, it did not provide the services required to bill even one (1) unit of ROM testing, much less the twelve (12) units it billed to Allstate for purported tests to that extremity.

131.   Similarly, the only lower extremity joints that were allegedly tested were T.K.'s hips, which is not enough to bill for even one (1) unit of ROM testing, much less the twelve (12) units Diagnostic Chiropractic billed to Allstate regarding T.K.'s hips.

132.   For T.K. and the other patients at issue herein, Diagnostic Chiropractic did not perform any billable service despite mailing and faxing bills to Allstate seeking payment often exceeding $10,000 per date of service for dozens of units of purported testing.

25

## C.   OTHER EXAMPLES OF BILLING FOR SERVICES NOT RENDERED

133.   The categories of billing for services not rendered addressed above were repeated with respect to numerous patients because they were part of standard protocols used by the defendants to overcharge Allstate for purported services.

134.   The defendants also regularly billed Allstate for services not rendered in ways that were unique to individual patients and purported treatments.

135.   The following are additional representative examples of the defendants billing for services not rendered to fraudulently increase their charges to Allstate:

     a.   Lint billed Allstate for TPII and LINT treatment purportedly performed by Super to D.B. and D.H. (Claim No. 0605977965) at Therapy Professionals LLC on twelve (12) dates each, from May 21, 2021 to July 23, 2021.   Super swore via affidavit that he had concerns regarding Therapy Professionals LLC's use of his Nervomatrix machines after learning of potential criminal indictments against the clinic and its owners, which caused him to send an associate to check on the machines.   Super would not have needed to send an associate to check on the machines if he was present at the clinic rendering services on twelve (12) separate dates as claimed by the bills submitted to Allstate, confirming that the services were not actually performed.

     b.   Duramed billed Allstate for renting a SAM ultrasound unit to E.S. (Claim No. 0569368137) on five (5) dates in September of 2021.   However, E.S. testified that he does not recall ever seeing a rental agreement for a SAM ultrasound unit and that the signature was not in his handwriting.   Kayal advised Allstate that E.S. did not actually receive a SAM ultrasound unit until October 2021.   Duramed also billed Allstate for coupling patches associated with the purported use of the SAM ultrasound unit on fifteen (15) dates but E.S. received patches on, at most, just three (3) dates.

c. AS Medical billed Allstate for six (6) separate alleged MRIs to M.M. (Claim No. 0579014598) on October 26, 2020. AS Medical does not possess an MRI machine, employ a radiologist, or otherwise have any basis at all to bill for MRIs. AS Medical did not even review in detail any records of MRIs that had previously been done by other providers of M.M., as the following is the entirety of reference to any imaging by AS Medical:

MRI done on 02/2020 of right shoulder , knee , ankle , brain lumbar cervical essentially negative

practice fusion

d. Supplies Plus billed for the alleged rental of a cold compression device to E.F. (Claim No. 0644579252) throughout the month of November 2021. Records of several other providers who evaluated and treated E.F. during this time period confirm that she did not actually have or use this DME. On October 28, 2021, the date on which Supplies Plus started billing, a pain management physician who repeatedly evaluated E.F. recorded "NONE" in his record where prompted to report the use of DME. On November 11, 2021 and November 29, 2021, this physician reported that E.F. was using a back brace but made no report of the use of a cold compression device, despite clearly discussing the use of DME with the patient. Throughout the entire time that Supplies Plus billed for the purported rental to E.F., a separate provider billed for attendant care services and submitted records detailing exactly what services were done. These records also mention assisting E.F. with a back brace but have no reference at all to the use or existence of the cold compression device for which Supplies Plus billed.

e. On July 26, 2022, AS Medical reported that C.B. (Claim No. 0571268069) allegedly wanted to start TPII and LINT treatment but was unable to because the Nervomatrix machine had been removed from her physical therapist's office. Despite this clear report that C.B. had been unable to obtain TPII and LINT treatment, AS Medical billed for such services within the three (3) weeks preceding this evaluation, on July 5, 2022 and July 12, 2022.

f. On March 8, 2022, defendant Lint billed for a purported telehealth evaluation of I.A. (Claim No. 0657296165) for which it claimed to perform several manual treatments, such as assessing trigger points

and tenderness to palpation that served as a purported basis for extensive treatment recommendations and which clearly could not have actually been performed via a telehealth encounter.  Lint also billed for TPII and LINT treatment on that date, which likewise could not have taken place during a telehealth appointment.

136.   All of the bills submitted by the defendants to Allstate through interstate wires and the U.S. Mail seeking payment for treatment that never occurred are fraudulent.

137.   Allstate is not required to pay the defendants for services that were never provided to patients at issue in this Complaint and is entitled to recover any payments tendered to the defendants as a result of their fraudulent billing for services not rendered.

## VI.   FORGED AND FALSIFIED MEDICAL RECORDS

138.   Lint and Super submitted altered, forged, and fabricated medical records in an effort to conceal their fraud and create the appearance of significant injury in order to support their charges submitted to Allstate for unnecessary services.

139.   The forged, altered, and falsified documents created by the defendants were submitted to deceive Allstate into paying for treatment and services that were illegal, medically unnecessary, or not rendered at all.

140.   Allstate is not required to pay any of the defendants for treatment and services that were ordered pursuant to forged, altered, or falsified records, and it is entitled to restitution for monies paid as a result of the defendants' fraud.

A.   **FORGED PRESCRIPTIONS**

141.   The defendants falsely claimed that the services for which they billed Allstate were ordered by physicians and chiropractors and supported such false claims by presenting Allstate with forms purportedly filled out and signed by physicians and chiropractors.

142.   Physicians and chiropractors who supposedly ordered the services billed to Allstate have confirmed that they did not do so and that the forms presented to Allstate were fabricated and their signatures were forged.

143.   For example, Geoffrey Sagala, D.C. ("Sagala") signed multiple affidavits stating that he never referred specific patients for whom Lint billed Allstate to Lint for any services, including patients D.C. and C.G. (Claim No. 0604144402).

144.   Sagala further confirmed that he has never referred a patient to Lint, and therefore all prescriptions bearing Sagala's name and signature were necessarily fabricated.

145.   Defendant Super testified by deposition with respect to D.C. (Claim No. 060414440), during which he claimed that Lint relied on this fabricated

prescription from Sagala and did not perform any independent evaluation of whether services were necessary for the patient.

146.   Similarly, Pedro Toweh, M.D. ("Toweh") was shown prescriptions on Lint's letterhead with his name and purported signature and he stated that the signature is not his.

147.   Toweh further stated that he did not use prescription forms generated by third parties in his practice and therefore any pre-printed prescription form from Lint with his name on it is a forgery.

148.   Defendant Duramed submitted alleged prescription forms that were pre-filled with Lint employee Cory Borawski's ("Borawski") name and signature and merely altered the dates on each document to create the appearance that DME had actually been ordered, including with respect to E.S. (Claim No. 0569368137), as documented below:

149.   Defendant Lint also submitted bills for alleged services that were prescribed with pre-signed forms, including the examples below relative to R.H. (Claim No. 0658195135) on which Julie Strief, D.C.'s name and signature were clearly pre-printed as evidenced by the altered second form that merely changed the date and address of the clinic:

**LINT CHIROPRACTIC PC**

Referral for **Trigger Points Impedance Imaging (TPII)**
Localized Intense Neurostimulation Therapy (LINT) (if necessary)

Today's Date: 10-20-22      Date of Accident: 2-6-22

Patient Name: R███████ H███████

Referring Physician: Julie Strief D.C.

Referring Physician Address: 24901 Northwestern Hwy Suite 315 Southfield, MI 48075

Treatment Location: Lint 1

In order to expedite scheduling of your patient, please fax demographic, insurance information and PR2 with request for authorization stating medical necessity together with this form. Your attention to this matter is greatly appreciated and will avoid unnecessary phone calls from us.

☒ M54.6   Thoracic Spine Pain
☒ M60.88  Thoracic Myofascitis

☒ M54.5   Lumbar Spine Pain
☒ M79.1   Lumbosacral Myofascitis

I, the undersigned, confirm the order for the aforementioned patient. It is my professional medical opinion that the use of the above-mentioned medical treatment is both reasonable and medically necessary for this patient. I have evaluated this patient and certify that the prescribed treatment is medically necessary. I declare under penalty of perjury that foregoing is true and correct.

Physician's Signature: Julie Strief D.C.

150. Defendant Supplies Plus also submitted bills for DME that was ordered using copied forms purporting to bear Borawski's signature.

151. Both of the forms below were for purported DME orders on December 1, 2021 for patients J.Z. (Claim No. 0581378494) and B.B. (Claim No. 0628529711), neither of whom were actually evaluated by Borawski, and included equipment for body parts that were not being evaluated or treated by any provider. As depicted in these examples, the only change to these forms was to re-write the date, which evidences that the same copied form was used on different dates as well:

- J.Z.:

and necessary with reference to the accepted standards of medical/chiropractic practice and treatment of this patient's condition.

☐Surgical   ☑Non-Surgical

**Initial Rental Length Needed:** ☐14 days   ☐21 days   ☑28days   ☐Other ___ days

**Use the following Settings:**

_____ times/day   use pressure ☑1 ☐2 ☐3 ☐4 ☐5   for ☐10 ☑15 ☐20 ☐25 ☐30 minutes

**Wraps Needed:**

☐Ankle   ☐Articulated Knee   ☑Back   ☐C/T Spine   ☐Hand/Wrist

☐Elbow   ☐Shoulder ☐R ☐L   ☐Knee   ☐Hip/Groin ☐R ☐L

I am writing on behalf of my patient that you approve coverage for the NICE Intermittent Pneumatic Compression and Cold Therapy System. I consider the device medically necessary and I am prescribing this device for the purpose of musculoskeletal injury treatment and/or post-operative treatment.

The NICE Recovery System combines cold and compression therapies. It is intended to treat post-surgical and acute injuries to reduce edema, swelling and pain where cold and compression are indicated.

RICE (Rest, Ice, Compression, Elevation) has long been used to treat injury and assist in rehabilitation following injury or orthopedic surgery. NICE Recovery combines the two most difficult-to-manage aspects of the RICE regimen (Ice and compression) by offering adjustable cold and intermittent compression in one easy-to-use system.

The anatomically designed wraps are engineered for all major body parts and utilize pneumatic compression and fluid circulation technology, simultaneously delivering circumferential cold and compression to most major joints.

My rehabilitative care plan calls for the use of the NICE Recovery device to reduce pain and swelling. Failure to control pain not only causes unnecessary suffering but can delay my patient's recovery. Therefore, need for compliance with the required treatment is high. I certify that the above described product is medically indicated and in my opinion is reasonable and necessary. Given the safety and effectiveness of this unit, I prescribed and recommended that the patient use this device daily. Without use of this device, there is potential to cause unnecessary delay in the patient's recovery.

If you have any questions, please feel free to contact my office.

Doctors Signature: _____   Date: 12-1-21

Doctors Name: Cory Borkowski

- B.B.:

and necessary with reference to the accepted standards of medical/chiropractic practice and treatment of this patient's condition.

☐Surgical   ☑Non-Surgical

**Initial Rental Length Needed:** ☐14 days   ☐21 days   ☑28days   ☐Other ___ days

**Use the following Settings:**

_____ times/day   use pressure ☑1 ☐2 ☐3 ☐4 ☐5   for ☐10 ☑15 ☐20 ☐25 ☐30 minutes

**Wraps Needed:**

☐Ankle   ☐Articulated Knee   ☑Back   ☐C/T Spine   ☐Hand/Wrist

☐Elbow   ☐Shoulder ☐R ☐L   ☐Knee   ☐Hip/Groin ☐R ☐L

I am writing on behalf of my patient that you approve coverage for the NICE Intermittent Pneumatic Compression and Cold Therapy System. I consider the device medically necessary and I am prescribing this device for the purpose of musculoskeletal injury treatment and/or post-operative treatment.

The NICE Recovery System combines cold and compression therapies. It is intended to treat post-surgical and acute injuries to reduce edema, swelling and pain where cold and compression are indicated.

RICE (Rest, Ice, Compression, Elevation) has long been used to treat injury and assist in rehabilitation following injury or orthopedic surgery. NICE Recovery combines the two most difficult-to-manage aspects of the RICE regimen (Ice and compression) by offering adjustable cold and intermittent compression in one easy-to-use system.

The rehabilitative designed wraps are engineered for all major body parts and utilize pneumatic compression and fluid circulation technology, simultaneously delivering circumferential cold and compression to most major joints.

My rehabilitative care plan calls for the use of the NICE Recovery device to reduce pain and swelling. Failure to control pain not only causes unnecessary suffering but can delay my patient's recovery. Therefore, need for compliance with the required treatment is high. I certify that the above described product is medically indicated and in my opinion is reasonable and necessary. Given the safety and effectiveness of this unit, I prescribed and recommended that the patient use this device daily. Without use of this device, there is potential to cause unnecessary delay in the patient's recovery.

If you have any questions, please feel free to contact my office.

Doctors Signature: _____   Date: 12/1/21

Doctors Name: Cory Borkowski

152.   Defendant Supplies Plus also billed Allstate for DME that was allegedly issued based on prescription forms on which doctors' signatures were simply forged, including the below example relative to I.A. (Claim No. 0657296165) that bears a purported signature of Borawski that has no resemblance to his actual signature (an example of which is also reproduced below):



## B.   FALSIFIED TPII AND LINT RECORDS

153.   Lint forged and falsified TPII and LINT reports to create the appearance that ten (10) or more trigger points were identified by the Nervomatrix machines.

154.   As noted previously, Super has testified that LINT treatment can only be done if the TPII scan identifies ten (10) trigger points for treatment.

155.   He also testified that the "Number of Potential Points" referenced in TPII reports refer to potential "treatment points."

156.   Therefore, in order to have ten (10) treatment points, there must be at least ten (10) potential points.

157.   Yet, Lint submitted multiple bills to Allstate for LINT treatment allegedly provided to more treatment points than potential treatment points identified in TPII reports.

158.   For each of the examples set forth herein where Lint, AS Medical, and MI Medical Management billed for alleged LINT services despite failing to identify enough (or in many cases, any) potential treatment points, they each always nevertheless fabricated records claiming to have rendered treatment to ten (10) treatment points.

159.   It is not possible to have a treatment point that is not also a potential treatment point and, per Super's testimony, it also is not possible that treatment was rendered to any of these potential treatment points when the total was less than ten (10).

160.   All of Lint's claims to have performed more services at more treatment points than potential points were necessarily fabricated based on the admissions and testimony of defendant Super.

## C.   FALSIFIED DME RECORDS

161.   The defendants forged and fabricated DME rental agreements to create the appearance that patients agreed to accept and were provided DME for which Duramed billed Allstate but that patients did not receive.

162.   As one example, Lint billed Allstate for an initial evaluation of E.S. (Claim No. 0569368137) on September 1, 2021 purportedly performed by Borawski.

163.   Lint claimed that Borawski prescribed E.S. with a SAM ultrasound unit and Duramed billed Allstate for a one (1) week rental of the unit as well as a 12-pack of coupling patches associated with purported use of the unit, and supported its bill through the submission of a rental agreement allegedly signed by E.S. on September 1, 2021.

164.   Kayal confirmed during testimony that E.S.'s initial evaluation was a telehealth visit over Zoom, meaning E.S. was not with Borawski during the evaluation and could not have signed the rental agreement on September 1, 2021.

165.   E.S. also was not physically with Borawski and could not have been given the SAM ultrasound unit on that date.

166.   Kayal confirmed this and agreed that E.S. did not actually receive the unit and E.S. testified that the handwriting on the rental agreement was not his.

167.   The defendants routinely submitted bills for DME for which prescriptions were allegedly signed by physicians who never evaluated patients, including the same physicians for whom the defendants clearly had signatures that were copied and reproduced on otherwise blank forms as set forth above.

168.   For example, Supplies Plus billed Allstate for a purported month-long rental of a cold compression device to H.L. (Claim No. 0650702392) at a rate of

$600 per day based on a prescription form allegedly signed by Borawski on December 7, 2021, but Borawski never evaluated the patient and would have had no basis to write such a prescription.

169.   Supplies Plus similarly billed for a rental of a cold compression device to J.W. (Claim No. 0636678229) beginning on October 28, 2021 based on a prescription allegedly signed by Borawski that day, but Borawski did not actually evaluate J.W. (if at all) until November 1, 2021, on which date Lint billed for a purported initial evaluation.

170.   Allstate is not required to pay the defendants for treatment and services that were done, if at all, pursuant to forged, altered, or falsified records, and it is entitled to restitution for monies paid as a result of the defendants' fraud.

### D.   OTHER FABRICATED RECORDS

171.   The defendants also created other false and fabricated records that were intended to create the appearance that the other services and items for which they billed Allstate, including TPII, LINT, and DME, were medically necessary and appropriate.

172.   For example, defendant AS Medical billed for an alleged evaluation and TPII and LINT to H.S. (Claim No. 0636118093) on September 21, 2021, despite reporting question marks for nearly all components of its purported examination and diagnoses:

**Lumbar:** TTP lumbar paraspinal muscles , Increased pain with flexion and extension,
Straight leg: ?? , Kemp's: ?? , Stork test: ?? , Faber's; ??

| Assessment | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |

The patient is experiencing symptoms which were not present prior to the accident and it is in my opinion that the patient's symptoms are causally related to the injuries sustained at the time of the accident.
1.??
2.??
3.??
4.??
5.??.

173. The defendants also routinely submitted records that were clearly copied-and-pasted from other patients and from templates that had no information about the patient to whom treatment was supposedly rendered.

174. For example, Lint frequently submitted its boilerplate records without even bothering to fill in fields that had placeholder question marks.

175. The following excerpt from defendant Lint records, which was submitted with multiple records for purported services to patient T.A. (Claim No. 0657882833), that were billed by defendant MI Medical Management, confirms that Lint had no evaluations or considerations specific to this patient and the entire record was a meaningless template:

**Conclusion**

This was the ? procedure for this patient. Patient tolerated the procedure well with no complications and was given post-procedure instructions.

Further improvement is expected.

Physician Signature:
Electronic signature on file
Haitham Masri, MD Lic# 5315062597

38

## VII.  UNLICENSED TREATMENT

176.   The defendants violated several Michigan laws and regulations in their effort to bill Allstate as much as possible, including laws and regulations requiring licensure for the lawful provision of medical treatments and services.

177.   In order to legally issue DME in Michigan, a provider must obtain a license from the Michigan Board of Pharmacy.

178.   A license from the Michigan Board of Pharmacy is required for all "drugs **and devices** manufactured, distributed, prescribed, dispensed, administered, or issued in this state . . . ."  Mich. Comp. Laws § 333.17722(a) (emphasis added).

179.   Duramed, Supplies Plus, and AS Medical billed Allstate for purportedly issuing DME despite never possessing a license to issue DME in the State of Michigan at any time relevant to this action.

180.   Not only was the DME billed by Duramed, Supplies Plus, and AS Medical medically unnecessary, as discussed in detail *infra*, because neither Duramed, Supplies Plus, nor AS Medical possessed a license to issue DME it was also unlawful and not compensable under the No-Fault Act.

181.   Allstate is not required to pay Duramed, Supplies Plus, and AS Medical for DME issued without a license and is entitled to restitution for payments it was induced to make by Duramed's, Supplies Plus's, and AS Medical's fraudulent bills.

## VIII.  <u>FRAUDULENT UNNECESSARY AND EXCESSIVE TREATMENT</u>

182.   The defendants' willingness to falsify records and to bill for services that were never rendered, services that were based on forged and fabricated prescriptions and records, and services that were rendered unlawfully demonstrates their willingness to also bill for treatment that was unreasonable and unnecessary.

183.   The defendants' goal was to bill for as much treatment as possible, regardless of whether such treatment was reasonably necessary to patients' care, recovery, rehabilitation, and/or arose out of an alleged motor vehicle accident, in order to generate bills to Allstate.

184.   The defendants' purported treatment also violated standards of care in the medical community, as services were not indicated, redundant, excessive, and repeated without any benefit to patients.

185.   The full extent of the defendants' misrepresentations regarding the (lack of) lawfulness and necessity of the treatment they billed was not known to Allstate until it undertook the full investigation that culminated in the filing of this action.

186.   The unnecessary treatment billed by the defendants, discussed more fully below, includes the treatment and patients set out in the charts annexed hereto at Exhibits 1 through 7.

187.   All of the insurance claims submitted by the defendants to Allstate through the U.S. Mail and interstate wires seeking payment for unnecessary, excessive, unlawful, and unreasonable treatment are fraudulent.

188.   Allstate is not required to pay the defendants for treatment that was medically unnecessary, and it is entitled to the return of money paid as a result of the defendants' fraud.

189.   None of the above facts were known to Allstate until it undertook its investigation that resulted in the commencement of this action, and are not evident within the four corners of the medical records and bills submitted to Allstate by the defendants.

### A.   UNNECESSARY TPII AND LINT

190.   As part of the defendant clinics' predetermined protocol, patients were immediately scheduled for TPII and LINT services in order to quickly generate massive bills to Allstate.

191.   Indeed, the form used by Lint to document purported "evaluations" included pre-printed checkboxes that left its physicians no choice but to order TPII and LINT services (along with DME) for every patient, as documented below:

**INITIAL TREATMENT PLAN AND RECOMMENDATIONS:**

☑I recommend my patient undergo trigger point impedance imaging (TPII) to identify the clinically relevant and emerging trigger points followed by localized intensive neurostimulation treatment (LINT).

❑Patient's initial treatment plan should consists of up to 6 treatments once a week in the effected region(s).

☑Re-evaluation every 4 week

☑Appropriate home exercise equipment is recommended to help with the long-term goal of restoring normal function and stabilization to optimize healing and prevent chronicity.
  ❑SAM Unit          ❑Cervical postural pump                    ❑LSO w/APL control custom
  ❑T.E.N.S. Unit                                        ❑Other_____

❑Objective range of motion testing and muscle testing should be done initially to establish baseline dysfunction and should be repeated monthly to objectively monitor the patients recovery, progress and the level of disability (loss of function)

192.   TPII and LINT services were then repeated many times to each patient without the defendants attempting to make any determination as to whether the purported treatment benefited patients.

193.   In order to falsely justify the excessive and unnecessary TPII and LINT treatment billed to Allstate, Lint, AS Medical, Excel, MI Medical, and their associates who purportedly wrote prescriptions for treatment (which were often forged, as detailed above) always diagnosed patients with myofascial pain syndrome with pain in either the thoracic or lumbar region, which are vague and non-specific diagnoses designed only to create the appearance of necessity for the treatment billed by the defendants.

194.   These vague and non-specific diagnoses were made even when the defendants possessed evidence and themselves reported that patients actually had more specific conditions.

195.   For example, AS Medical diagnosed G.C. (Claim No. 0549042489) with several specific disc and facet joint conditions allegedly based on interpretation of MRI imaging.

196.   However, in order to create the appearance of necessity and propriety for TPII and LINT bills, AS Medical also claimed that G.C.'s pain was myofascial (i.e., not discogenic or facet joint mediated).

197.   Rather than attempt to treat the actual source of G.C.'s alleged pain that AS Medical claimed to have identified, it instead billed Allstate tens of thousands of dollars for worthless TPII and LINT, most of which was not actually performed at all as explained above.

198.   That AS Medical's purported evaluation of G.C. was designed to do nothing more than fabricate a justification for TPII and LINT is also evidenced by its disregard for other clinically relevant findings.

199.   For example, on January 8, 2021, AS Medical billed for an evaluation with an additional $200 charge for a purported urine drug screen that tested positive for cocaine, marijuana, and barbiturates.

200.   In response to this clear evidence of abuse of multiple classes of drugs, AS Medical reported "urine drug screen completed and appropriate," and ignored the actual results of the drug screen because addressing those results may have prevented it from billing for additional TPII and LINT.

201.   The defendants regularly billed Allstate over $4,000 per date of alleged service to purportedly identify trigger points using TPII.

202.   Trigger points are areas of taut muscle bands or palpable knots of the muscle that are painful on compression.

203.   Trigger points are very easily identified through normal evaluations, including manual palpation, and TPII is not medically necessary to assess the presence of a trigger point.

204.   According to the defendants, TPII evaluation was billed "to confirm the diagnosis of myofascial pain syndrome and identify and localize myofascial trigger points."

205.   To the extent that the defendants evaluated patients at all before setting them on courses of TPII and LINT to generate tens of thousands of dollars in bills, their chiropractors and physicians purported to diagnose trigger points themselves without the necessity of a Nervomatrix machine or a $4,000 additional (and repeated) charge.

206.   Most patients at issue herein were also already receiving in-office myofascial release treatment.

207.   Moreover, a "syndrome" is simply a group of symptoms and not a specific diagnosis that can be confirmed at all.

208. Purported TPII evaluations were also billed by the defendants multiple times per patient without any explanation as to why these purported syndromes needed to be reconfirmed and without any reason to suspect that patients' conditions had changed.

209. Indeed, aside from being purportedly necessary for Nervomatrix machines to generate bills for unnecessary LINT treatments, the TPII measurements allegedly taken by Lint, AS Medical, Excel, and MI Medical were not incorporated into any other aspect of patients' treatment plans.

210. In addition to being easily identified by routine manual evaluations, trigger points can be and routinely are addressed with simple treatments such as massage, application of cold packs, application of hot moist packs, ultrasound, electrical muscle stimulation, acupuncture, trigger point injections, and a variety of other methods.

211. There is no evidence that LINT provides any therapeutic benefit beyond traditional methods of chiropractic treatment and physical therapy.

212. Most patients at issue herein were already undergoing traditional physical therapy or chiropractic treatment at the time LINT treatment was ordered and billed, making such purported treatment redundant and unnecessary.

213. Lint, AS Medical, Excel, and MI Medical rarely recorded patients' reactions to treatment, making it impossible to determine what effect, if any,

treatment had on patients or whether there was a basis to continue treatment or alter patients' treatment plans.

214.   Not only did Lint, AS Medical, Excel, and MI Medical bill Allstate for excessive and medically unnecessary when compared to patients' overall clinical pictures, they also billed for alleged treatment that was not indicated by their own standards and the standards of the manufacturer of the Nervomatrix machines.

215.   According to the CEO of the company that created the Nervomatrix machine, treatment should involve (6) sessions over approximately three (3) weeks, and pain should subside for four (4) months.

216.   The defendants billed for many times this amount of treatment to multiply their charges to Allstate, including:

   a.   Defendants AS Medical and Lint collectively billed for TPII and LINT services to G.C. (Claim No. 0549042489) on at least nineteen (19) separate dates.

   b.   Defendant Lint billed for at least eleven (11) separate TPII and LINT services to I.A. (Claim No. 0657296165), who was just fifteen (15) years old at the time.

   c.   Defendant Lint billed TPII and LINT services to R.H. (Claim No. 0658195135) on at least forty-five (45) separate dates.

217.   Super testified that TPII and LINT services should be billed "a week apart to make sure [the patient] tolerated the treatment well."

218.   Lint, AS Medical, Excel, and MI Medical routinely Allstate billed for multiple purported TPII and LINT services just days apart.

219.   The following are several representative examples of the defendants billing for back-to-back alleged treatment sessions, which were unnecessary and improper:

a.   Lint billed Allstate for purported TPII and LINT services to R.H. (Claim No. 0658195135) on May 25, 2022 and again just one (1) day later on May 26, 2022.

b.   Lint billed Allstate for purported TPII and LINT services to H.M. (Claim No. 0641555024) on October 25, 2021 and again just one (1) day later on October 26, 2021.

c.   Lint billed Allstate for purported TPII and LINT services to P.S. (Claim No. 0641555024) on December 15, 2021 and again just one (1) day later on December 16, 2021.

d.   Lint billed Allstate for purported TPII and LINT services to G.J. (Claim No. 0626158497) on June 3, 2021 and again just one (1) day later on June 4, 2021.

e.   AS Medical billed Allstate for purported TPII and LINT services to G.C. (Claim No. 0549042489) on August 16, 2021 and again just three (3) days later on August 19, 2021.

f.   MI Medical billed Allstate for purported TPII and LINT services to N.J. (Claim No. 0619748709) on March 15, 2022 and again just two (2) days later on March 17, 2022.  Then, MI Medical again billed Allstate for purported TPII and LINT services to N.J. on April 5, 2022 and again just two (2) days after that on April 7, 2022.

220.   By Super's own admission, it was excessive and improper to bill Allstate for these repeated treatments that did not give patients time to get accustomed and confirm the prior treatment was tolerated.

221.   Super also testified that the success of treatment can be determined based on the "Number of Potential Points" data allegedly generated by TPII, and that "you're going to see a decrease from beginning to end of treatment," which indicates the treatment was successful.

222.   Despite this allegedly objective indicator of utility of treatment, Lint, AS Medical, Excel, and MI Medical continued billing Allstate even when treatment was unsuccessful.

223.   As just one example, Lint falsely billed for TPII and LINT services to R.H. (Claim No. 0658195135) on February 23, 2022 despite claiming to have found only six (6) potential treatment points.

224.   Just five (5) days later, Lint billed for repeat services and claimed to have found fifteen (15) potential treatment points in the same area of R.H.'s spine.

225.   To the extent that any treatment was rendered at all to R.H., such purported services resulted in nearly tripling the number of trigger points in his lumbar spine.

226.   Despite this evidence that the treatment was not working, Lint continued to bill for TPII and LINT to R.H. for a total of forty-five (45) different dates with the number of potential treatment points increasing to as high as twenty-five (25).

227.   Patients have also reported that these purported TPII and LINT services were not helpful and, in some cases, that they increased their pain.

228.   For example, J.W. (Claim No. 0636678229) testified that his back pain worsened after he underwent TPII and LINT services at Lint.

229.   The following patients further exemplify the defendants' billing for excessive and medically unnecessary TPII and LINT treatment:

a.   Defendant Excel reported that C.T. (Claim No. 0614797981) had thoracic back pain of 5/10 on April 14, 2022. On April 21, 2022, April 28, 2022, and May 5, 2022, Excel billed Allstate for TPII and LINT. Then, on May 12, 2022, Excel billed Allstate for another follow-up evaluation and claimed that C.T. was "getting excellent relief with the Nervomatrix therapy." Despite this claim, C.T. actually reported an increase in thoracic pain but no increase of pain levels in body areas that did not allegedly receive TPII and LINT services, confirming that the treatment not only provided no benefit but also may have harmed the patient.

b.   Defendant Lint billed Allstate on six (6) dates in May and June of 2021 for TPII and LINT services to C.H. (Claim No. 0621628205). Lint never evaluated C.H.'s response to the alleged treatment. During this time, physical therapy was also billed by Hoover Physical Therapy, LLC ("Hoover PT"), which reported that C.H.'s lower back pain levels began to decrease before Lint started billing for TPII and LINT, confirming that traditional methods of therapy were successful. Then, ten (10) days after Lint completed billing for TPII and LINT services, another provider billed Allstate for lumbar trigger point injections, evidencing that the TPII and LINT did not resolve the issues with C.H.'s trigger points. Then, after months of additional physical therapy treatment with multiple facilities, in September of 2021, C.H.'s pain levels were reported as being mild. Nevertheless, on October 5, 2021, Lint billed Allstate for another initial evaluation of C.H. and claimed his back pain was 8/10, contradicting other providers and creating the appearance of necessity for its bills for two (2) additional dates of TPII and LINT.

c.     Lint billed Allstate for TPII and LINT services on twelve (12) dates from May 21, 2021 to July 23, 2021 to D.B. (Claim No. 0605977965), which far exceeds the (6) sessions recommended by the company that manufactures the Nervomatrix machines.  Lint failed to document any improvement from the alleged treatment and no explanation as to why so many sessions were appropriate.

d.     T.K. (Claim No. 0644145962) was allegedly involved in a motor vehicle accident on June 18, 2021.  That same month, Revival began billing Allstate for physical therapy and reported reducing pain levels from June 2021 through September 2021.  Despite this evidence that physical therapy was working, Lint billed Allstate for five (5) dates of TPII and LINT services from September 22, 2021 to November 11, 2021.  In addition to the fact that T.K. had improved with traditional therapy, once Lint began billing for treatment, T.K.'s pain levels began to increase, confirming that Lint's treatment was not only medically unnecessary but also ineffective and potentially harmful to the patient.

e.     B.B. (Claim No. 0628529711) was allegedly involved in a motor vehicle accident on February 26, 2021.  From June 2021 through February 2022, B.B. allegedly received multiple injections and a radiofrequency ablation procedure to her lower back, after which she routinely reported her pain as 2/10 or 3/10.  Despite this long-lasting improvement with treatment, Lint billed Allstate on four (4) dates of service for TPII and LINT services over the course of just nine (9) days from January 3, 2022 through January 12, 2022.  Lint's treatment was unnecessary as B.B. received substantial relief through other modes of treatment and there was no evidence it provided any relief to B.B. as her pain level remained consistent before and after the alleged TPII and LINT services.

230.   The lack of medical necessity of TPII and LINT services is further evidenced by the fact that the purported treatments were allegedly administered by a wide variety of practitioners who did not have any specialized chiropractic training or training in the use of Nervomatrix machines.

231.   For example, MI Medical submitted bills for alleged TPII and LINT services to D.B. (Claim No. 0613644228) administered by a cosmetic surgeon named Haitham Masri, M.D., who has no training in chiropractic medicine or otherwise in the provision of treatment for spinal injuries.

### B.   UNNECESSARY DME

232.   Allstate was billed for DME with respect to nearly all of its insureds that were purportedly evaluated by Lint, nearly always consisting of either a cold compression pump billed by defendant Supplies Plus or a SAM ultrasound unit billed by defendant Duramed.

233.   The DME billed by Duramed and Supplies Plus was handed to patients during their initial appointments at Lint and other associated medical clinics, which evidences that it was preselected and not specific to patients' individual needs.

234.   Often, the DME that was claimed to be necessary by Lint was not what was billed for by Duramed and Supplies Plus, further evidencing that the DME was medically unnecessary.

235.   As just one example, Lint billed Allstate for an initial evaluation of C.H. (Claim No. 0621628205) on October 5, 2021.

236.   As part of its initial treatment plan, Lint created a document that stated that a SAM ultrasound unit for home use was indicated:

☑ Appropriate home exercise equipment is recommended to help with the long-term goal of restoring
normal function and stabilization to optimize healing and prevent chronicity.
  ☐ SAM Unit            ☐ Cervical postural pump              ☐ LSO w/APL control custom
        ☐ T.E.N.S. Unit                                    ☐ Other_____

237.  Allstate was instead billed by Supplies Plus for a "Nice1" cold
compression unit with no explanation as to what warranted the change in device or
how the device would help with C.H.'s reported pain.

238.  Lint never billed for another evaluation for C.H., so C.H. was never
questioned about his use or the efficacy of the device.

239.  As another example, Supplies Plus billed Allstate for renting a Nice1
cold compression unit to J.Z. (Claim No. 0581378494) starting on December 1,
2021.

240.  The prescription form was allegedly signed by Borawski, who never
actually evaluated J.Z., and included wraps for the patient's back, knee, and
shoulder.

241.  Throughout his evaluations and treatment with several other facilities,
there had been no report of J.Z. complaining of knee pain and references to shoulder
pain were in the context of alleged referred pain from his neck (i.e., not a suspected
separate injury to the shoulder).

242.  Including additional wraps that served no purpose allowed Lint to
(falsely) bolster the charges generated for expensive equipment without regard for
patient need.

243.   The Nice1 cold compression unit that was purportedly rented to patients at issue herein by Supplies Plus is approved by the Food and Drug Administration to treat post-surgical or acute injuries.

244.   The defendants routinely ordered and Supplies Plus billed for issuing these devices months after patients were allegedly injured (i.e., not in the acute stage of injury).

245.   As noted above, Lint billed Allstate for an initial evaluation of C.H. (Claim No. 0621628205) eight (8) months after his alleged motor vehicle accident and the medical record made no mention of recent surgeries to substantiate a need for the cold compression unit.

246.   Ordering and billing for Nice1 cold compression units for indications for which the device is not approved and has no proven medical efficacy cannot serve a valid medical purpose.

247.   As another example of the defendants billing for medically unnecessary DME, Lint billed Allstate for an initial evaluation of E.S. (Claim No. 0569368137) on September 1, 2021 at which time it ordered, and Duramed billed, for the rental of a SAM ultrasound unit.

248.   E.S. allegedly signed thirty (30) day rental agreements for the unit on September 1, 2021 and November 3, 2021.

249.   Despite indicating the need for a follow-up evaluation, Lint never billed for another evaluation for E.S., meaning it also never questioned E.S. regarding the efficacy of the device despite continuing to prescribe it for an additional two (2) months.

250.   Duramed's SAM ultrasound units are approved for use in post-surgical and acute injuries, a fact which Duramed has confirmed in its filings with the Securities and Exchange Commission ("SEC") wherein it reported "the Company serves the post-surgery medical patient arena" (emphasis added).

251.   Like Supplies Plus, Duramed regularly billed for the alleged issuance of its SAM ultrasound devices to patients who had not had surgery and who were not in the acute phase of their claimed injuries.

252.   DME that was issued and billed as part of a predetermined treatment protocol, and not to address the specific conditions or treatment needs of the patient, is not payable under the Michigan No-Fault Act.

C.   **UNNECESSARY ROM AND MMT**

253.   Diagnostic Chiropractic billed for extensive range of motion ("ROM") and manual muscle testing ("MMT") despite the fact that patients were already undergoing evaluation and purported treatment with other providers where such measurements were routinely obtained, confirming that the tests billed by Diagnostic Chiropractic were redundant and served no medical purpose.

54

254.   When performed properly, ROM and muscle testing are used to assess baseline levels (1) to guide clinic plans and (2) to gauge improvement over the course of treatment.

255.   For a typical patient, evaluations and reevaluations (and bills for the same) include all the necessary evaluation tools, including the performance of ROM and MMT.

256.   Initial evaluation reports by Lint regularly documented ROM and muscle testing findings and did not include a referral or rationale for additional testing.

257.   Yet Diagnostic Chiropractic routinely billed Allstate for additional ROM and muscle testing of patients, usually only one (1) week after an initial evaluation was billed by Lint.

258.   For example, Lint billed Allstate for an initial evaluation of C.H. (Claim No. 0621628205) on October 5, 2021 and reported reduced ROM and normal muscle measurements.

259.   Diagnostic Chiropractic then billed Allstate for purported additional ROM and muscle testing to C.H. that was not ordered by any physician one (1) week later on October 12, 2021.

260. Not only were Diagnostic Chiropractic's services medically unnecessary because they were duplicative of services already billed by Lint, they were also medically unnecessary because the tests were not ordered by a physician.

261. Diagnostic Chiropractic also regularly billed Allstate for purported testing of patients who were undergoing courses of evaluation and treatment with other physicians who did not order such testing to be done and who did not even acknowledge an awareness that such testing had been done.

262. For example, Diagnostic Chiropractic inexplicably billed for alleged ROM and muscle testing to H.H. (Claim No. 0539794809) on April 27, 2022.

263. H.H. had been undergoing treatment with several medical providers since at least 2019, all of which was focused on a diagnosis of chronic regional pain syndrome ("CRPS") in her ankle and foot.

264. Without any referral from H.H.'s treating physicians or any report back to H.H.'s treating physicians about purported results, Diagnostic Chiropractic billed for extensive testing of H.H.'s spine and other extremities, none of which were the subject of her contemporaneous treatment with other providers.

265. Similarly, on January 10, 2022, Diagnostic Chiropractic billed for alleged extensive ROM and muscle testing to J.Z. (Claim No. 0581378494), including to his neck and extremities.

266.   J.Z. was allegedly undergoing a course of TPII and LINT billed by Lint at the time (though there was no reference to or explanation for the referral to Diagnostic Chiropractic), but the purported Lint treatment was limited to J.Z.'s lumbar spine, which was inexplicably not among the extensive alleged tests billed by Diagnostic Chiropractic.

267.   Diagnostic Chiropractic also billed Allstate for testing that had no bearing on patients' treatment despite expressly reporting in its records that the services were done in order to formulate a treatment plan.

268.   For example, Diagnostic Chiropractic billed Allstate for ROM and muscle testing for B.B. (Claim No. 0628529711) on December 8, 2021 and January 10, 2022.

269.   During this time, B.B. was also receiving treatment at On Hand Physical Therapy Inc. ("On Hand PT").

270.   Despite multiple visits with On Hand PT, there is no indication that it was even aware of the extensive ROM and muscle testing reports created by Diagnostic Chiropractic.

271.   Allstate is not required to pay for medically unnecessary treatment and testing that served no medical purpose and was not properly ordered.

272.   Because Diagnostic Chiropractic billed for the same predetermined course of extensive testing for nearly every patient, regardless of their age, injury, co-morbidities, or status, such testing could not have been medically appropriate.

## IX.   **FRAUDULENT BILLING PRACTICES**

273.   Providers like the defendants have a responsibility to select and submit the billing code that accurately and truthfully identifies the services performed and the complexity involved in rendering those services.

274.   The defendants failed to meet this responsibility and instead submitted bills at unreasonable charges to Allstate for medically unnecessary and excessive services and used fraudulent billing practices, as discussed *infra*.

275.   All of the medical records, bills, and invoices submitted to Allstate by the defendants contained CPT and Healthcare Common Procedure Coding System ("HCPCS") codes.

276.   By utilizing CPT and HCPCS codes to submit billing to Allstate, the defendants represented that the services they billed for corresponded to and were accurately described by the descriptions for the CPT and HCPCS codes they chose.

277.   The defendants never communicated to Allstate that they intended that the CPT and HCPCS codes they used to submit bills have any meanings other than those ascribed by the American Medical Association ("AMA") and the Centers for

Medicare and Medicaid Services ("CMS"), which publish CPT and HCPCS codes, respectively.

278.    Allstate reasonably relied on the representations and published definitions assigned to the CPT and HCPCS codes billed by the defendants.

279.    Allstate reasonably relied on the defendants' utilization of CPT and HCPCS codes to accurately report the services they rendered to Allstate insureds.

280.    The bills submitted to Allstate by the defendants were submitted on Health Insurance Claim Forms ("HICF") approved by the National Uniform Claim Committee ("NUCC") and referenced in the NUCC Instruction Manual.

281.    The back of all HICF forms contains the following language in bold font: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

282.    Despite the warning on the back of the HICF forms, the defendants included false, incomplete, and misleading information in the bills and medical records submitted to Allstate through interstate wires and the U.S. Mail.

A.    FRAUDULENT USE OF CPT CODE 97799

283.    Diagnostic Chiropractic billed Allstate seeking payment for treatment that was purportedly rendered to patients using CPT code 97799, which is meant to

be used for physical medicine and rehabilitation services or procedures for which there is no other specific CPT designated code assignment.

284.   According to Diagnostic Chiropractic, the services for which it billed Allstate using CPT code 97799 were "manual muscle testing" using "JTECH Northstar software, a computerized muscle strength evaluation system."

285.   According to the AMA's coding guidelines, computerized muscle testing should be billed using CPT code 97750 ("Physical performance test or measurement (e.g., musculoskeletal, functional capacity), with written report, each 15 minutes"), not CPT code 97799.

286.   CPT code 97750 is a timed code that CMS paid at $34.92 per unit in 2021, which is approximately 1/10th of what Diagnostic Chiropractic charged Allstate for just one (1) unit of its muscle testing services (and, as noted above, it routinely billed dozens of units for a single patient on a single date).

287.   By claiming to have performed manual muscle testing rather than computerized testing, Diagnostic Chiropractic falsely indicated there was a basis to use an unlisted billing code instead of the proper billing code.

288.   Diagnostic Chiropractic mislabeled its services and intentionally billed Allstate using an improper, unlisted billing code in an effort to validate unreasonably high charges for the services rendered.

**B.   IMPROPER BILLING FOR RANGE OF MOTION TESTING**

289.   Even if Diagnostic Chiropractic used the correct CPT codes to bill for its purported testing, the bills it submitted to Allstate would still be improper.

290.   For example, on January 10, 2022, Diagnostic Chiropractic billed Allstate for thirty-four (34) units of ROM testing of B.B. (Claim No. 0628529711) using CPT code 95851.

291.   As discussed above, only one (1) unit of CPT code 95851 may be billed per extremity or spine section, but Diagnostic Chiropractic instead routinely billed Allstate per test, which resulted in thousands of dollars of improper bills for each patient.

292.   Moreover, even Diagnostic Chiropractic's improper use of the CPT codes still resulted in bills for more tests than were claimed to have been performed.

293.   Diagnostic Chiropractic claimed that ROM testing was performed on B.B.'s lumbar spine and hip consisting of four (4) lumbar spine tests and twelve (12) hip tests all of which were reported in two (2) different sections of Diagnostic Chiropractic's report, giving the appearance that over thirty (30) tests were performed even though the tests were actually only done once (if at all).

294.   Allstate is not required to pay Diagnostic Chiropractic for duplicative and improperly billed services and is entitled to restitution for payments it was induced to make by Diagnostic Chiropractic's fraudulent bills.

### C.   IMPROPER CODING OF DME

295.   Supplies Plus billed Allstate for the rental of Nice1 cold compression units using HCPCS code E1399, which is a miscellaneous code intended for use only when there is no HCPCS code that specifically describes the DME issued.

296.   The Nice1 cold compression therapy system is described by the manufacturer as a cold water circulating pack with a powered inflatable tube massager.

297.   HCPCS code E0218 for a "fluid circulating cold pad with pump" directly describes the Nice1 devices purportedly issued by Supplies Plus and would therefore be the appropriate code to bill (assuming all other requirements were also met).

298.   Supplies Plus fraudulently and intentionally billed Allstate using an improper, miscellaneous billing code in an effort to evade the No-Fault Act's fee schedule and to validate the unreasonably high charges it billed for the rental of the Nice1 device.

### D.   DOUBLE BILLED ROM TESTING

299.   The defendants double billed Allstate by separately billing for individual components of a procedure that are included in another billing code also billed for the same date of service.

300.   Diagnostic Chiropractic billed Allstate for allegedly performing ROM testing using CPT code 95851 and always billed for muscle testing on the same dates.

301.   According to the AMA, "[c]odes designated as separate procedures should not be reported in addition to the code for the total procedure or service for which they are considered an integral component. In this case, because range of motion testing (95851) … may be performed as part of a physical performance test or measurement (eg, musculoskeletal or functional capacity), only code 97750 should be reported."   Manual Muscle Testing, Range of Motion Testing, and Physical Test or Measurement, 18(5) CPT Assistant (2008).

302.   ROM testing is considered an integral component of the computerized muscle testing when both are billed on the date of service for the same patient and cannot be billed as a separate service.

303.   Diagnostic Chiropractic routinely billed Allstate separately for ROM testing that was included in the computerized muscle testing performed on the same date of service for the same patient, which constitutes fraudulent double billing.

## X.   EXCESSIVE AND UNREASONABLE CHARGES

304.   Claims for medical benefits under Michigan's No-Fault Act can only be made for "reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation."  Mich. Comp. Laws § 500.3107(1)(a).

305.   The defendants routinely billed Allstate at rates that were unreasonable and had no relation to the services allegedly performed.

306.   The defendants knew that the amounts they billed Allstate were unreasonable at the time the charges were submitted and intentionally billed these excessive and unreasonable amounts as part and in furtherance of their scheme to defraud Allstate by inducing it to pay the defendants monies they were not entitled to receive.

307.   The potential of receiving a windfall to which they were not entitled by charging unreasonable and excessive amounts also motivated the defendants' decision to bill Allstate for treatment not rendered and unlawful and unnecessary treatment, and was their motivation to resort to fraudulent billing practices as described *supra*.

308.   In each such case, including those described in the following subsections, Allstate was harmed when it was induced to pay the unreasonable amounts billed by the defendants.

309.   Allstate also was harmed even when it did not pay the unreasonable and excessive amounts charged by the defendants, because it was nevertheless obligated to investigate and adjust each insurance claim thereby incurring costs.

A.    **E**XCESSIVE AND **U**NREASONABLE **C**HARGES FOR **TPII** AND **LINT**

310.   The defendants billed for alleged TPII using CPT code 95999 for as much as $4,787.50 and LINT using CPT code 99199 for as much as $1,350.

311.   Both CPT code 95999 and 99199 are unlisted procedure codes.

312.   There are multiple factors to consider when determining the proper charges for unlisted procedures, including the nature of the service provided and its necessity based on the documentation and the relative value of similar treatments.

1.    **Excessive Charges for TPII Services**

313.   Nervomatrix machines are classified as "stimulator, nerve, transcutaneous for pain relief" according to the FDA and are intended for use as a "Transcutaneous Electrical Nerve Stimulation (TENS) for back pain relief."

314.   Typically, as part of the service associated with the application of TENS to a patient, a qualified health care provider would perform a pre-service assessment in order to determine the location of trigger points and apply TENS based on the outcome of that assessment.

315.   As such, this pre-service would be included in the TENS therapy and would not be billed as a separate service, making billing for TPII entirely improper.

316.   However, the defendants describe TPII as a diagnostic tool, used to confirm a diagnosis of myofascial pain syndrome.

317.   When trigger point injections are performed, ultrasound guidance may be used to find the correct placement of the needles.

318.   Thus, based on the defendants' own claims, the TPII portion of treatment is similar in relative value to CPT code 76942 ("Ultrasonic guidance for needle placement (e.g., biopsy, aspiration, injection and localization device), imaging supervision and interpretation").

319.   In 2021, the CMS payment rate for CPT code 76942 was $59.95, meaning the charges submitted by the defendants for TPII testing were 79 times higher than the CMS-approved amount for similar services.

### 2.   Excessive Charges for LINT Services

320.   Literature addressing Nervomatrix machines describe them as multi-phasic with varying degrees of frequency applied to a concentrated specific targeted area that is performed in the presence of a qualified attendant who can make adjustment to the settings in response to the patient's tolerance of the procedure.

321.   As such, in determining similar treatment to LINT for billing purposes, CPT code 97032 ("manual electrical stimulation to one or more areas, each 15 minutes") is comparable to the alleged LINT treatments billed by the defendants.

322.   In 2021, the CMS payment rate for CPT code 97032 was $15.20, meaning the charges submitted by the defendants for TPII testing were over 8,000% higher than the CMS-approved amount.

323.   Additionally, the CEO of the company that manufactures Nervomatrix machines has stated that the average six (6) week treatment protocol could cost in the range of $400, while six (6) treatments billed by the defendant clinics total over $36,000.

324.   The defendants' charges are patently unreasonable and the defendants cannot sustain their burden of proving otherwise.

B.   EXCESSIVE AND UNREASONABLE CHARGES FOR DME

325.   In addition to being unlicensed, medically unnecessary, and issued contrary to applicable standards of care, as discussed *supra*, the DME billed by defendants Supplies Plus and Duramed were charged at unreasonable rates.

326.   Supplies Plus billed Allstate $600 per day for cold compression unit rentals to patients at issue in this Complaint.

327.   The only unit rented was the Nice1 cold compression therapy system, which can be purchased online for $3,995.

328.   Supplies Plus billed for twenty-eight (28) to thirty (30) day rentals of the units, for a total of $16,800 to $18,000 per patient.

329.   A patient could purchase the same unit four (4) times for the amount Supplies Plus billed Allstate just for renting the device for mere weeks.

330.   Moreover, there are other substantially similar devices on the market that cost far less than the Nice1 system.

331.   For example, a GameReady cold compression device is substantially similar to the Nice1 system and sells for $1,000 less than the Nice1 unit.

332.   The systems are so similar that Cool Systems, Inc., the manufacturer of the GameReady device, sued Nice Recovery Systems LLC ("Nice Recovery") for patent infringement due to the Nice1 unit's similarity to the Game Ready device.

333.   Nice Recovery even acknowledged the similarities when requesting FDA approval by stating in its application that the "Nice1 is substantially equivalent to the Game Ready System."

334.   There are also other cold compression units such as the Polar care wave cold compression unit that performs the same service for a total purchase price of $330 with one wrap that can be used for multiple body areas, further evidencing that Supplies Plus's charges were excessive and unreasonable.

335.   Duramed submitted charges to Allstate for the rental of a SAM ultrasound device that exceeded the cost for patients to purchase the device by thousands of dollars.

336.   For example, Duramed billed Allstate $22,950 for the rental of a SAM ultrasound device and supplies with respect to patient E.S. (Claim No. 0569368137).

337.   Duramed's parent company reported in filings with the Securities and Exchange Commission that it purchases its SAM ultrasound devices for a price of $2,447 per unit.

338.   Thus, Duramed billed an amount for renting its SAM ultrasound device that was more than 9 times Duramed's cost to purchase the unit.

339.   Allstate is not required to pay Supplies Plus and Duramed for DME for which it was charged more than reasonable and customary rates, and is entitled to the return of all sums paid due to the fraudulent issuance and billing of DME by Supplies Plus and Duramed.

### C.   EXCESSIVE AND UNREASONABLE CHARGES FOR ROM AND MUSCLE TESTING

340.   Diagnostic Chiropractic billed Allstate for medically unnecessary ROM and muscle testing at unreasonable and excessive amounts.

341.   As a purported justification for its billing, Diagnostic Chiropractic has transmitted to Allstate a chargemaster stating that it billed for ROM and manual muscle testing.

342.   As previously addressed, this conflicts with what is represented by the actual records, which state that the testing is computerized.

343.   However, even if one were to accept the defendants' false statements as true, the charges submitted to Allstate would still be well outside of what could be considered reasonable.

344.   In 2019, the CMS payment rate for manual muscle testing of the extremities or trunk, not including hands, was $33.66 and $43.46 for manual muscle testing of the body excluding hands.

345.   Diagnostic Chiropractic routinely billed Allstate $6,600 per patient for muscle testing of the spine and extremities.

346.   Even if Diagnostic Chiropractic performed testing for the entire body (excluding hands), which it never did, the most CMS would pay would be $43.46.

347.   Diagnostic Chiropractic's charge of $6,600 is an over 15,000% markup of the maximum amount CMS would allow.

348.   In 2021 and 2022, the CMS payment rate for ROM testing of each extremity or each trunk section was $23.20 and $21.28, respectively.

349.   Even if Diagnostic Chiropractic billed for ROM testing of the entire body (excluding hands), which it never did, at most CMS allowed $162.40 in 2021 and $148.96 in 2022.

350.   Diagnostic Chiropractic routinely billed $10,200 for ROM testing, which is an over 6,000% markup of the amount CMS allowed in both 2021 and 2022.

351.   While Allstate does not contend that the defendants' charges must match CMS's payment rate, such an extreme markup compared to the amounts paid by other payors is *per se* unreasonable.

352.   Diagnostic Chiropractic's charges for ROM and muscle testing are not and were not reasonable and the defendants cannot sustain their burden of proving otherwise.

### D.   IMPROPERLY BILLED EVALUATIONS

353.   Lint and Super improperly billed Allstate for initial patient evaluations.

354.   New patient evaluations are paid at higher rates than established patient evaluations, and improperly claiming to have performed multiple initial evaluations for the same patient allowed Lint to increase its charges to Allstate.

355.   If a patient has already received professional services from a physician, or another physician in the same group and the same specialty, within the prior three years, that patient is considered an established patient, not a new patient.

356.   On October 5, 2021, Lint submitted a bill to Allstate for an initial evaluation of C.H. (Claim No. 0621628205).

357.   However, on six (6) separate dates of service from May 21, 2021 through June 7, 2021, Lint billed Allstate for TPII and LINT treatments to C.H., confirming that C.H. was not a new patient on October 5, 2021.

358.   Allstate is not obligated to pay any pending bills for improperly coded office visits and is entitled to restitution for those office visits for which it has already adjusted the claim due to the misrepresentations by Lint and Super.

## XI.   MISREPRESENTATIONS MADE BY THE DEFENDANTS AND RELIED ON BY ALLSTATE

### A.   MISREPRESENTATIONS BY THE DEFENDANTS

359.   To induce Allstate to pay promptly their fraudulent charges, the defendants submitted and caused to be submitted to Allstate false documentation

that materially misrepresented that the services they referred and billed for were necessary within the meaning of the Michigan No-Fault Act, that the charges for the same were reasonable, and that all treatment was lawfully and actually rendered.

360.   Claims for medical benefits under Michigan's No-Fault Act can only be made for "reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation." Mich. Comp. Laws § 500.3107(1)(a).

361.   Moreover, claims for medical benefits under Michigan's No-Fault Act can only be made for services that are "lawfully render[ed]." Mich. Comp. Laws § 500.3157(1).

362.   Thus, every time the defendants submitted bills and medical records to Allstate supporting their claims for No-Fault benefits, the defendants necessarily warranted that such bills and records related to lawfully and actually rendered and necessary treatment for their patients' care, recovery, or rehabilitation.

363.   There are no less than ten (10) separate reasons why the defendants' alleged treatment was not in fact performed, was not lawful, was not medically necessary, and was fraudulently billed to Allstate:

   a. Lint, Duramed, Diagnostic Chiropractic, and Super routinely billed for services that were not performed at all.

   b. Lint, Duramed, Excel, and Super forged prescriptions and falsified and altered medical records to bill for services that were not actually ordered, were not necessary, and were not performed at all.

72

c. Duramed, Supplies Plus, AS Medical, and Super unlawfully billed for DME without possessing the licensure or authorization required by the State of Michigan.

d. The defendants used an improper predetermined treatment protocol, implemented by use of vague findings and predetermined diagnoses, to order and bill for unnecessary and excessive services, testing, and DME.

e. Lint, Excel, MI Medical, AS Medical, and Super billed for medically unnecessary TPII and LINT treatment in furtherance of the scheme to bill Allstate as much as possible, and not based on the individual needs of patients.

f. Lint ordered and Duramed, Supplies Plus, and Super billed for DME that was medically unnecessary and ordered in violation of applicable standards of care in furtherance of the scheme to bill Allstate as much as possible and not based on the individual needs of patients.

g. Diagnostic Chiropractic and Super billed for medically unnecessary ROM and muscle testing in violation of applicable standards of care in furtherance of the scheme to bill Allstate as much as possible and not based on the individual needs of patients.

h. Diagnostic Chiropractic and Super submitted bills using multiple CPT codes to describe the same procedure allegedly performed, which constitutes fraudulent double billing.

i. Diagnostic Chiropractic, Supplies Plus, and Super used improper CPT and HCPCS codes to describe services allegedly performed in order to increase the amount of bills submitted to Allstate.

j. Lint, MI Medical, Duramed, Supplies Plus, Diagnostic Chiropractic, Excel, AS Medical, and Super submitted bills at rates that had no basis and were many times higher than was reasonable to charge for services/DME, if such services/DME were provided at all.

364.  As detailed *supra*, the defendants frequently violated established standards of care, treated excessively, and billed for treatment without basis or adequate substantiation.

365.  If treatment is not required for a patient's care, recovery, or rehabilitation, such treatment is not medically necessary.

366.  The foregoing facts – including billing for services not rendered, forging and falsifying medical records, billing for treatment without a license, using a predetermined treatment protocol to generate charges for unnecessary services, and misrepresenting the necessity of treatment, testing, and devices – were not, and could not have been, known to Allstate until it commenced its investigation of the defendants shortly before the filing of this action.

367.  Taken as a whole, the prevalence of such facts and the defendants' failure to abide by accepted standards of care render the treatment and testing by the defendants unnecessary and unlawful.

368.  The fact of unnecessary treatment is present with respect to every patient at issue in this Complaint, including those specific patient examples set out above and in the charts annexed at Exhibits 1 through 7.

369.  Thus, each claim for payment (and accompanying medical records) under Michigan's No-Fault Act faxed and mailed to Allstate by, on behalf of, or with the knowledge of the defendants constitutes a misrepresentation because the

treatment underlying the claim was not lawful and medically necessary, as it must be in order to be compensable under Michigan law.

370.   Moreover, each HICF submitted to Allstate by the defendants contained the following notation: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

371.   Through the submission of patient records, invoices, HICFs, and other medical documentation to Allstate via interstate wires and the U.S. Mail, the defendants attested to the fact, lawfulness, and medical necessity of the visits, examinations, testing, procedures, DME, and ancillary services for which they billed Allstate.

372.   As the defendants did not render lawful and reasonably necessary medical treatment and testing, and misrepresented the treatment and testing purportedly performed, each bill and accompanying documentation faxed or mailed by or on behalf of the defendants to Allstate constitutes a material misrepresentation.

### B.   ALLSTATE'S JUSTIFIABLE RELIANCE

373.   The facially valid documents submitted to Allstate by the defendants were designed to, and did in fact, induce Allstate to rely on the documents.

374.   At all relevant times, the defendants concealed from Allstate facts regarding the fact, lawfulness, and medical necessity of services allegedly provided and referred by them to prevent Allstate from discovering that the claims submitted by and on behalf of the defendants were not compensable under the No-Fault Act.

375.   These misrepresentations include submitting false medical documentation, including HICFs, documenting the fact, lawfulness, and necessity of medical treatment, testing, and services in order to seek payment under Michigan's No-Fault Act.

376.   Evidence of the fraudulent scheme detailed in this Complaint was not discovered until after patterns had emerged and Allstate began to investigate the defendants, revealing the true nature and full scope of their fraudulent scheme.

377.   Due to the defendants' material misrepresentations and other affirmative acts designed to conceal their fraudulent scheme, Allstate did not and could not have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

378.   In reliance on the defendants' misrepresentations, Allstate paid money to the defendants to its detriment.

379.   Allstate would not have paid these monies had the defendants provided true and accurate information about the fact, lawfulness, and necessity of the referrals and medical services billed.

380.    As a result, Allstate has incurred costs in adjusting the insurance claims submitted by the defendants and paid money to the defendants in reasonable reliance on the false medical documentation and false representations regarding the defendants' eligibility for payment under the Michigan No-Fault Act.

## XII.    MAIL AND WIRE FRAUD RACKETEERING ACTIVITY

381.    As discussed above, the referrals, treatment, and services billed by the defendants were not medically necessary, were unlawful, and were fraudulently billed.

382.    The objective of the scheme to defraud Allstate, which occurred throughout the period noted in Exhibits 1 through 7, was to collect No-Fault benefits to which the defendants were not entitled because the medical services and DME provided, if at all, were not necessary and were not lawfully rendered, were fraudulently billed, and were billed at excessive and unreasonable amounts.

383.    This objective necessarily required the submission of bills for payment to Allstate.

384.    The defendants created, prepared, and submitted false medical documentation and placed in a post office and/or authorized depository for mail matter things to be sent and delivered by the United States Postal Service or sent through faxes over interstate wires.

385.  All documents, medical records, notes, reports, HICFs, medical diagnoses, letters, correspondence, and requests for payment in connection with the insurance claims referenced throughout this pleading traveled through interstate wires or the U.S. Mail.

386.  All medical records and bills submitted through interstate wires by the defendants were faxed from the defendants in Michigan to Allstate in Iowa.

387.  Allstate received all medical records and bills faxed to it by the defendants in Iowa.

388.  Every automobile insurance claim detailed herein involved at least one (1) use of the U.S. Mail, including the mailing of, among other things, the notice of claim and insurance payments.

389.  It was foreseeable to the defendants that faxing bills and medical records to Allstate would trigger mailings in furtherance of the scheme to defraud, including actual payment of fraudulent bills via checks mailed by Allstate.

390.  Every payment at issue in this Complaint where Allstate was induced to rely on the defendants' false medical records and bills was tendered via a check mailed by Allstate using the U.S. Mail.

391.  The fraudulent medical billing scheme detailed herein generated hundreds of mailings and faxes.

392.   A chart highlighting representative examples of mail and wire fraud arising from the defendants' patient/business files is annexed hereto at Exhibit 8.

393.   As detailed herein, the defendants also submitted, caused to be submitted, or knew medical documentation and claims for payment would be submitted to Allstate via fax or mail related to each exemplar patient discussed in this Complaint.

394.   It was within the ordinary course of business for Lint, MI Medical, Duramed, Supplies Plus, Diagnostic Chiropractic, Excel, and AS Medical to submit claims for No-Fault payment to insurance carriers like Allstate through faxes and the U.S. Mail.

395.   Moreover, the business of billing for medical services by each of the entity defendants at issue herein is regularly conducted by fraudulently seeking payment to which each defendant clinic is not entitled through the use of fraudulent communications sent via faxes and the U.S. Mail.

396.   In other words, discrete (claim- and patient-specific) instances of mail and wire fraud are a regular way of doing business for each of the entity defendants.

397.   The entity defendants, at the direction and with the knowledge of their owners and managers (including defendant Super), continue to submit claims for payment to Allstate and, in some instances, continue to commence litigation against Allstate seeking to collect on unpaid claims.

398.   Thus, the defendants' commission of mail and wire fraud continues.

399.   As all of the defendants named herein agreed that they would use (and, in fact, did use) the mails in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed mail fraud, as defined in 18 U.S.C. § 1341.

400.   As several of the defendants named herein agreed that they would use (and, in fact, did use) faxes over interstate wires in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed wire fraud, as defined in 18 U.S.C. § 1343.

401.   Allstate reasonably relied on the submissions it received from the defendants, including the submissions set out in Exhibits 1 through 8 annexed hereto and identified in the exemplar claims above.

402.   As the defendants agreed to pursue the same criminal objective (namely, mail and wire fraud), they committed a conspiracy within the meaning of the RICO Act, 18 U.S.C. § 1962(d), and are therefore jointly and severally liable for Allstate's damages.

## XIII. **DAMAGES**

403.   The fraudulent conduct by the defendants injured Allstate in its business and property by reason of the aforesaid violations of law.

404.   For the reasons set forth in this Complaint, Allstate seeks compensatory damages against the defendants for the amounts Allstate has paid to them and paid because of them and their conduct.

405.   Every payment claimed by Allstate as damages was made by Allstate alone.

406.   Moreover, every payment made by Allstate derives from a check sent by Allstate to the defendants through the U.S. Mail.

407.   As such, the defendants knew that the U.S. Mail would be used as part of their scheme to defraud as the defendants only faxed and mailed medical records and bills for the purpose of having Allstate rely on such documents and mail payment in response thereto.

408.   Allstate also seeks damages, in an amount to be determined at trial, related to the cost of claims handling/adjustment for claims mailed and faxed by the defendants, which includes the cost of investigation to uncover the fraudulent nature of the claims submitted by the defendants.

409.   The total damages sought by Allstate by this Complaint exceeds the amount of $75,000 against each defendant.

410.   Allstate investigated each of the defendants both individually and in connection with the comprehensive scheme detailed herein and incurred investigative and claims handling expenses with respect to each defendant.

## XIV.  CAUSES OF ACTION

### COUNT I
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Lint Enterprise)
### Against MI Medical Management, LLC; Duramed MI, LLC; Supplies Plus MI, LLC; Diagnostic Chiropractic MI, P.C.; Excel Medical Group, PLC; AS Medical Group, PLC; and Robert Super, D.C.

411.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 410 set forth above as if fully set forth herein.

412.   Lint constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

413.   In connection with each of the claims identified in the within Complaint, defendants MI Medical, Duramed, Supplies Plus, Diagnostic Chiropractic, Excel, AS Medical, and Super ("Count I defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Lint, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Lint's business, or should have reasonably foreseen that the mailing and faxing of such false medical documentation by Lint would occur, in furtherance of the Count I defendants' scheme to defraud.

414.   The Count I defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including those mailings and faxes identified in the chart annexed hereto at Exhibit 8.

415.   As documented above, the Count I defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Lint, which they knew would be billed by Lint, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

416.   Super owned, managed, and controlled Lint and was responsible for all actions taken by Lint and its staff.

417.   Duramed, Supplies Plus, and Super issued unlawful and unnecessary DME to patients of Lint, which was used to create the appearance of injury and support for bills submitted by Lint.

418.   Diagnostic Chiropractic submitted bills for medically unnecessary ROM and muscle testing, the results of which were used to create the appearance of injury to Lint patients and support for bills submitted by Lint.

419.   MI Medical, Excel, and AS Medical billed for alleged TPII and LINT services using Nervomatrix machines owned and controlled by Lint, thereby providing Lint with revenue to perpetuate the fraudulent scheme described herein.

420.   The Count I defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Lint to continue billing for unlawful and medically unnecessary treatment.

421.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Lint for the benefit of the Count I defendants that would not otherwise have been paid.

422.   The Count I defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

423.   By virtue of the Count I defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT II
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Lint Enterprise)
**Against MI Medical Management, LLC; Duramed MI, LLC; Supplies Plus MI, LLC; Diagnostic Chiropractic MI, P.C.; Excel Medical Group, PLC; AS Medical Group, PLC; and Robert Super, D.C.**

424.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 410 set forth above as if fully set forth herein.

425.   Defendants MI Medical, Duramed, Supplies Plus, Diagnostic Chiropractic, Excel, AS Medical, and Super ("Count II defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Lint.

426.   The Count II defendants each agreed to further, facilitate, support, and operate the Lint enterprise.

427.   As such, the Count II defendants conspired to violate 18 U.S.C. § 1962(c).

428.   The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Lint even though Lint was not eligible to collect such payments by virtue of its unlawful conduct.

429.   The Count II defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves and the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

430.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count II defendants' unlawful conduct described herein.

431.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count II defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count II defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT III
## VIOLATION OF 18 U.S.C. § 1962(c)
### (MI Medical Enterprise)
### Against Lint Chiropractic PC; Diagnostic Chiropractic MI, P.C.; and Robert Super, D.C.

432.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 410 set forth above as if fully set forth herein.

433.   MI Medical constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

434.   In connection with each of the claims identified in the within Complaint, defendants Lint, Diagnostic Chiropractic, and Super ("Count III defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by MI Medical, or knew that such false medical documentation would be faxed and mailed in the ordinary course of MI Medical's business, or should have reasonably foreseen that the mailing and faxing of such false medical documentation by MI Medical would occur, in furtherance of the Count III defendants' scheme to defraud.

435.   The Count III defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including those mailings and faxes identified in the chart annexed hereto at Exhibit 8.

436.   As documented above, the Count III defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by MI Medical, which they knew would be billed by MI Medical, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

437.   Super owned, managed, and controlled MI Medical and was responsible for all actions taken by MI Medical and its staff.

438.   Lint and Super owned and controlled the Nervomatrix machines that were used for the medically unnecessary TPII and LINT services billed by MI Medical.

439.   Diagnostic Chiropractic submitted bills for medically unnecessary ROM and muscle testing, the results of which created the appearance of injury to patients and support for bills submitted by MI Medical.

440.   The Count III defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted MI Medical to continue billing for unlawful and medically unnecessary treatment.

441.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued

payment drafts to MI Medical for the benefit of the Count III defendants that would not otherwise have been paid.

442.   The Count III defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

443.   By virtue of the Count III defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by him, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IV
### VIOLATION OF 18 U.S.C. § 1962(d)
### (MI Medical Enterprise)
### Against Lint Chiropractic PC; Diagnostic Chiropractic MI, P.C.; and Robert Super, D.C.

444.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 410 set forth above as if fully set forth herein.

445.   Defendants Lint, Diagnostic Chiropractic, and Super ("Count IV defendants") conspired to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of MI Medical.

446.   The Count IV defendants agreed to further, facilitate, support, and operate the MI Medical enterprise.

447.   As such, the Count IV defendants conspired to violate 18 U.S.C. § 1962(c).

448.   The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of MI Medical even though MI Medical was not eligible to collect such payments by virtue of its unlawful conduct.

449.   The Count IV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves and the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

450.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count IV defendants' unlawful conduct described herein.

451.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count IV defendants are liable to Allstate and Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by or on behalf of the Count IV defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT V
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Duramed Enterprise)
### Against Lint Chiropractic PC; Diagnostic Chiropractic MI, P.C.; and Robert Super, D.C.

452.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 410 set forth above as if fully set forth herein.

453.   Duramed constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

454.   In connection with each of the claims identified in the within Complaint, defendants Lint, Diagnostic Chiropractic, and Super ("Count V defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Duramed, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Duramed's business, or should have reasonably foreseen that the mailing and faxing of such false medical documentation by Duramed would occur, in furtherance of the Count V defendants' scheme to defraud.

455.   The Count V defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including those mailings and faxes identified in the chart annexed hereto at Exhibit 8.

456.   As documented above, the Count V defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for DME that was purportedly provided by Duramed, which they knew would be billed by Duramed, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

457.   Super managed and controlled Duramed and was responsible for all actions taken by Duramed and its staff.

458.   Lint and Super ordered and wrote prescriptions for medically unnecessary and excessive DME that allowed Duramed to submit the bills at issue herein.

459.   Diagnostic Chiropractic submitted bills for medically unnecessary ROM and muscle testing, the results of which created the appearance of injury to Duramed patients and support for bills submitted by Duramed.

460.   The Count V defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Duramed to continue billing for unlawful and medically unnecessary DME.

461.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued

payment drafts to Duramed for the benefit of the Count V defendants that would not otherwise have been paid.

462.   The Count V defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

463.   By virtue of the Count V defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VI**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Duramed Enterprise)**
**Against Lint Chiropractic PC; Diagnostic Chiropractic MI, P.C.; and Robert Super, D.C.**

464.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 410 set forth above as if fully set forth herein.

465.   Defendants Lint, Diagnostic Chiropractic, and Super ("Count VI defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Duramed.

466.   The Count VI defendants each agreed to further, facilitate, support, and operate the Duramed enterprise.

467.   As such, the Count VI defendants conspired to violate 18 U.S.C. § 1962(c).

468.   The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Duramed even though Duramed was not eligible to collect such payments by virtue of its unlawful conduct.

469.   The Count VI defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves and the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

470.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count VI defendants' unlawful conduct described herein.

471.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count VI defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VI defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VII
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Supplies Plus Enterprise)
### Against Lint Chiropractic PC; Diagnostic Chiropractic MI, P.C.; and Robert Super, D.C.

472.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 410 set forth above as if fully set forth herein.

473.   Supplies Plus constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

474.   In connection with each of the claims identified in the within Complaint, defendants Lint, Diagnostic Chiropractic, and Super ("Count VII defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Supplies Plus, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Supplies Plus's business, or should have reasonably foreseen that the mailing and faxing of such false medical documentation by Supplies Plus would occur, in furtherance of the Count VII defendants' scheme to defraud.

475.   The Count VII defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including those mailings and faxes identified in the chart annexed hereto at Exhibit 8.

476.   As documented above, the Count VII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for DME that was purportedly provided by Supplies Plus, which they knew would be billed by Supplies Plus, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

477.   Super owned, managed, and controlled Supplies Plus and was responsible for all actions taken by Supplies Plus and its staff.

478.   Lint and Super ordered and wrote prescriptions for medically unnecessary and excessive DME that allowed Supplies Plus to submit the bills at issue herein.

479.   Diagnostic Chiropractic submitted bills for medically unnecessary ROM and muscle testing, the results of which created the appearance of injury to Supplies Plus patients and support for bills submitted by Supplies Plus.

480.   The Count VII defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Supplies Plus to continue billing for unlawful and medically unnecessary DME.

481.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued

payment drafts to Supplies Plus for the benefit of the Count VII defendants that would not otherwise have been paid.

482.  The Count VII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

483.  By virtue of the Count VII defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VIII**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Supplies Plus Enterprise)**
**Against Lint Chiropractic PC; Diagnostic Chiropractic MI, P.C.; and Robert Super, D.C.**

484.  Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 410 set forth above as if fully set forth herein.

485.  Defendants Lint, Diagnostic Chiropractic, and Super ("Count VIII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Supplies Plus.

486.  The Count VIII defendants each agreed to further, facilitate, support, and operate the Supplies Plus enterprise.

487. As such, the Count VIII defendants conspired to violate 18 U.S.C. § 1962(c).

488. The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Supplies Plus even though Supplies Plus was not eligible to collect such payments by virtue of its unlawful conduct.

489. The Count VIII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves and the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

490. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count VIII defendants' unlawful conduct described herein.

491. By virtue of this violation of 18 U.S.C. § 1962(d), the Count VIII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VIII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

<u>**COUNT IX**</u>
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Diagnostic Chiropractic Enterprise)**
**Against Lint Chiropractic PC and Robert Super, D.C.**

492.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 410 set forth above as if fully set forth herein.

493.   Diagnostic Chiropractic constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

494.   In connection with each of the claims identified in the within Complaint, defendants Lint and Super ("Count IX defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Diagnostic Chiropractic, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Diagnostic Chiropractic's business, or should have reasonably foreseen that the mailing and faxing of such false medical documentation by Diagnostic Chiropractic would occur, in furtherance of the Count IX defendants' scheme to defraud.

495.   The Count IX defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including those mailings and faxes identified in the chart annexed hereto at Exhibit 8.

496.   As documented above, the Count IX defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would

be submitted to Allstate for medical services that were purportedly performed by Diagnostic Chiropractic, which they knew would be billed by Diagnostic Chiropractic, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

497.   Super managed and controlled Diagnostic Chiropractic and was responsible for all actions taken by Diagnostic Chiropractic and its staff.

498.   Lint and Super arranged for patients to undergo the medically unnecessary diagnostic testing that was billed by Diagnostic Chiropractic.

499.   The Count IX defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Diagnostic Chiropractic to continue billing for unlawful and medically unnecessary treatment.

500.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Diagnostic Chiropractic for the benefit of the Count IX defendants that would not otherwise have been paid.

501.   The Count IX defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

502.   By virtue of the Count IX defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason

of the claims submitted, caused to be submitted, or known to be submitted by him,

and others acting in concert with them, together with the costs of suit, including

reasonable attorney's fees.

## COUNT X
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Diagnostic Chiropractic Enterprise)
### Against Lint Chiropractic PC and Robert Super, D.C.

503.  Allstate re-alleges, re-pleads, and incorporates by reference paragraphs

1 through 410 set forth above as if fully set forth herein.

504.  Defendants Lint and Super ("Count X defendants") conspired to violate

18 U.S.C. § 1962(c) through the facilitation of the operation of Diagnostic

Chiropractic.

505.  The Count X defendants agreed to further, facilitate, support, and

operate the Diagnostic Chiropractic enterprise.

506.  As such, the Count X defendants conspired to violate 18 U.S.C. §

1962(c).

507.  The purpose of the conspiracy was to obtain insurance payments from

Allstate on behalf of Diagnostic Chiropractic even though Diagnostic Chiropractic

was not eligible to collect such payments by virtue of its unlawful conduct.

508.  The Count X defendants were aware of this purpose and agreed to take

steps to meet the conspiracy's objectives, including inter-referrals between

themselves and the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

509. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count X defendants' unlawful conduct described herein.

510. By virtue of this violation of 18 U.S.C. § 1962(d), the Count X defendants are liable to Allstate and Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by or on behalf of the Count X defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**<u>COUNT XI</u>**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Excel Enterprise)**
**Against Lint Chiropractic PC; AS Medical Group, PLC; and Robert Super, D.C.**

511. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 410 set forth above as if fully set forth herein.

512. Excel constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

513. In connection with each of the claims identified in the within Complaint, defendants Lint, AS Medical, and Super ("Count XI defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation

101

by Excel, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Excel's business, or should have reasonably foreseen that the mailing and faxing of such false medical documentation by Excel would occur, in furtherance of the Count XI defendants' scheme to defraud.

514. The Count XI defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including those mailings and faxes identified in the chart annexed hereto at Exhibit 8.

515. As documented above, the Count XI defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Excel, which they knew would be billed by Excel, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

516. Lint and Super owned and controlled the Nervomatrix machines that Excel used to bill for the medically unnecessary TPII and LINT services.

517. AS Medical used common medical providers with Excel to bill for TPII and LINT services, and worked in concert to create the appearance of propriety for these unnecessary services.

518. The Count XI defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of

injury and permitted Excel to continue billing for unlawful and medically unnecessary treatment.

519. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Excel for the benefit of the Count XI defendants that would not otherwise have been paid.

520. The Count XI defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

521. By virtue of the Count XI defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by him, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Excel Enterprise)
### Against Lint Chiropractic PC; AS Medical Group, PLC; and Robert Super, D.C.

522. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 410 set forth above as if fully set forth herein.

523.   Defendants Lint, As Medical, and Super ("Count XII defendants") conspired to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Excel.

524.   The Count XII defendants agreed to further, facilitate, support, and operate the Excel enterprise.

525.   As such, the Count XII defendants conspired to violate 18 U.S.C. § 1962(c).

526.   The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Excel even though Excel was not eligible to collect such payments by virtue of its unlawful conduct.

527.   The Count XII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves and the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

528.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count XII defendants' unlawful conduct described herein.

529.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count XII defendants are liable to Allstate and Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by or on behalf of

the Count XII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XIII
### VIOLATION OF 18 U.S.C. § 1962(c)
### (AS Medical Enterprise)
### Against Lint Chiropractic PC; Excel Medical Group, PLC; and Robert Super, D.C.

530.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 410 set forth above as if fully set forth herein.

531.   AS Medical constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

532.   In connection with each of the claims identified in the within Complaint, defendants Lint, Excel, and Super ("Count XIII defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by AS Medical, or knew that such false medical documentation would be faxed and mailed in the ordinary course of AS Medical's business, or should have reasonably foreseen that the mailing and faxing of such false medical documentation by AS Medical would occur, in furtherance of the Count XIII defendants' scheme to defraud.

533.   The Count XIII defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain

dates, including those mailings and faxes identified in the chart annexed hereto at Exhibit 8.

534.   As documented above, the Count XIII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by AS Medical, which they knew would be billed by AS Medical, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

535.   Lint and Super controlled the Nervomatrix machine that AS Medical used to bill for medically unnecessary TPII and LINT services.

536.   Excel used common medical providers with AS Medical to bill for TPII and LINT services, and worked in concert to create the appearance of propriety for these unnecessary services.

537.   The Count XIII defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted AS Medical to continue billing for unlawful and medically unnecessary services.

538.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to AS Medical for the benefit of the Count XIII defendants that would not otherwise have been paid.

539. The Count XIII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

540. By virtue of the Count XIII defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by him, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XIV
## VIOLATION OF 18 U.S.C. § 1962(d)
### (AS Medical Enterprise)
### Against Lint Chiropractic PC; Excel Medical Group, PLC; and Robert Super, D.C.

541. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 410 set forth above as if fully set forth herein.

542. Defendants Lint, Excel, and Super ("Count XIV defendants") conspired to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of AS Medical.

543. The Count XIV defendants agreed to further, facilitate, support, and operate the AS Medical enterprise.

544. As such, the Count XIV defendants conspired to violate 18 U.S.C. § 1962(c).

545.   The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of AS Medical even though AS Medical was not eligible to collect such payments by virtue of its unlawful conduct.

546.   The Count XIV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves and the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

547.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count XIV defendants' unlawful conduct described herein.

548.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count XIV defendants are liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XIV defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XV**
**COMMON LAW FRAUD**
**Against All Defendants**

549.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 410 set forth above as if fully set forth herein.

550.   The scheme to defraud perpetrated by Lint, MI Medical, Duramed, Supplies Plus, Diagnostic Chiropractic, Excel, AS Medical, and Super ("Count XV defendants") was dependent upon a succession of material misrepresentations of fact that the defendants were entitled to collect benefits pursuant to applicable provisions of the Michigan No-Fault Act.

551.   The misrepresentations of fact made by the Count XV defendants include those material misrepresentations discussed in section XI.A, *supra*.

552.   The Count XV defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

553.   The misrepresentations were intentionally made by the Count XV defendants in furtherance of their scheme to defraud Allstate by submitting, causing to be submitted, or knowing that non-compensable claims for payment pursuant to applicable provisions of the Michigan No-Fault Act would be submitted to Allstate.

554.   The Count XV defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that are not compensable under Michigan law.

555.   Allstate reasonably relied upon such material misrepresentations to its detriment in paying numerous non-meritorious bills for alleged medical expenses pursuant to insurance claims and in incurring expenses related to the adjustment and processing of insurance claims submitted by the defendants.

556.   As a direct and proximate result of the defendants' fraudulent representations and acts, Allstate has been damaged in its business and property as previously described herein.

## COUNT XVI
## CIVIL CONSPIRACY
## Against All Defendants

557.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 410 set forth above as if fully set forth herein.

558.   Defendants Lint, MI Medical, Duramed, Supplies Plus, Diagnostic Chiropractic, Excel, AS Medical, and Super ("Count XVI defendants") combined and acted in concert to accomplish the unlawful purpose of defrauding Allstate by submitting claims for payment pursuant to applicable provisions of the Michigan No-Fault Act to which they were not entitled because (1) the defendants did not actually render the treatment for which claims were submitted, (2) the defendants did not provide reasonably necessary medical treatment, (3) the defendants did not lawfully render treatment, and (4) the defendants engaged in fraudulent billing practices.

559.   The Count XVI defendants worked together to achieve an unlawful purpose (namely, defrauding Allstate for personal gain).

560.   This purpose was known to all of the Count XVI defendants and intentionally pursued.

561.   Indeed, as detailed above, the Count XVI defendants engaged in inter-referrals to each other of patients for unnecessary treatment and testing so that each could submit improper bills to Allstate.

562.   Despite knowing that the defendants were not entitled to payment pursuant to applicable provisions of the Michigan No-Fault Act because they billed for services that were not actually provided, because they billed for services that were not reasonably necessary, because treatment was not lawfully rendered, and because they engaged in fraudulent billing practices, the Count XVI defendants nonetheless submitted, caused to be submitted, or knew that claims would be submitted (with accompanying false medical documentation) to Allstate seeking payment.

563.   In reasonable reliance on the false medical documentation submitted by the defendants, Allstate paid certain of the claims submitted.

564.   All of the Count XVI defendants directly benefited from the payments made to Lint, MI Medical, Duramed, Supplies Plus, Diagnostic Chiropractic, Excel, and AS Medical.

565.   All of the Count XVI defendants actively and intentionally partook in a scheme to defraud Allstate and also encouraged and aided other Count XVI defendants in the commission of acts done for the benefit of all Count XVI defendants and to the unjustified detriment of Allstate.

566.    Accordingly, all of the Count XVI defendants are equally liable for the

fraud perpetrated on Allstate pursuant to their conspiracy.

## COUNT XVII
## PAYMENT UNDER MISTAKE OF FACT
**Against Lint Chiropractic PC; MI Medical Management, LLC; Duramed MI, LLC; Supplies Plus MI, LLC; Diagnostic Chiropractic MI, P.C.; Excel Medical Group, PLC; and AS Medical Group, PLC**

567.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs

1 through 410 set forth above as if fully set forth herein.

568.    Allstate paid the amounts described herein under a misunderstanding,

misapprehension, error, fault, or ignorance of material facts, namely, the scheme to

defraud Allstate by misrepresenting the fact, lawfulness, and necessity of services

purportedly provided and billed by Lint, MI Medical, Duramed, Supplies Plus,

Diagnostic Chiropractic, Excel, and AS Medical ("Count XVII defendants").

569.    Allstate sustained damages by paying under a mistake of fact the claims

submitted by the Count XVII defendants, which misrepresented the fact,

reasonableness, necessity, and lawfulness of the medical services and DME

allegedly provided and whether the patient's injury arose out of a motor vehicle

accident.

570.    The Count XVII defendants, individually and jointly, would be unjustly

enriched if permitted to retain the payments made to them by Allstate under a

mistake of fact.

571. Allstate is entitled to restitution from each of the Count XVII defendants, individually and jointly, for all monies paid to and/or received by them from Allstate.

572. The Count XVII defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

## COUNT XVIII
### UNJUST ENRICHMENT
### Against All Defendants

573. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 410 set forth above as if fully set forth herein.

574. Defendants Lint, MI Medical, Duramed, Supplies Plus, Diagnostic Chiropractic, Excel, AS Medical, and Super ("Count XVIII defendants") submitted, caused to be submitted, or benefited from claims submitted to Allstate that caused Allstate to pay money, in reasonable belief that it was legally obligated to make such payments based upon the defendants' fraudulent misrepresentations.

575. Allstate's payments constitute a benefit that the Count XVIII defendants aggressively sought and voluntarily accepted.

576. The Count XVIII defendants wrongfully obtained or benefited from payments from Allstate through the fraudulent scheme detailed herein.

577. The Count XVIII defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

## COUNT XIX
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against All Defendants

578.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 410 set forth above as if fully set forth herein.

579.   Defendants Lint, MI Medical, Duramed, Supplies Plus, Diagnostic Chiropractic, Excel, AS Medical, and Super ("Count XIX defendants") routinely billed for unnecessary and unlawful services with respect to the patients at issue in this Complaint.

580.   The Count XIX defendants also billed for services not rendered.

581.   The Count XIX defendants also billed for services pursuant to a fraudulent scheme whereby patients were subjected to a predetermined treatment protocol for the purpose of generating bills to Allstate, and not for the purpose of providing reasonably necessary medical treatment, testing, DME, or services.

582.   Pursuant to the Michigan No-Fault Act, an insurer is liable to pay benefits only for reasonable and necessary expenses for lawfully rendered treatment arising out of a motor vehicle accident.  Mich. Comp. Laws §§ 500.3105, 500.3107, and 500.3157(1).

583.   The lack of reasonableness and necessity are defenses to an insurer's obligation to pay No-Fault benefits arising out of a motor vehicle accident.  Mich. Comp. Laws § 500.3107.

584.   The lack of lawfully-rendered treatment (such as treatment arising from illegal solicitation and unlicensed treatment) is also a defense to an insurer's obligation to pay No-Fault benefits.  Mich. Comp. Laws §§ 500.3157(1).

585.   Where a provider is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of a motor vehicle accident, there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

586.   The Count XIX defendants continue to submit claims under applicable provisions of the Michigan No-Fault Act for unnecessary and unlawfully rendered medical services to Allstate, and other claims remain pending with Allstate.

587.   The Count XIX defendants will continue to submit claims under applicable provisions of the Michigan No-Fault Act absent a declaration by this Court that Allstate has no obligation to pay fraudulent pending and previously-denied insurance claims submitted by any of the Count XIX defendants for any or all of the reasons set out in the within Complaint.

588.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XIX defendants billed for unnecessary and unlawful treatment that is not compensable under applicable provisions of the Michigan No-Fault Act.

589.   Allstate also requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XIX defendants were engaged in a fraudulent scheme whereby they billed for unnecessary and unlawful treatment and submitted unreasonable charges for the same to Allstate at all relevant times.

590.   As such, the Count XIX defendants have no standing to submit, pursue, or receive benefits or any other payment from Allstate, and Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XIX defendants cannot seek payment from Allstate for benefits under Michigan's No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq.*, any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint.

591.   Allstate further requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XIX defendants cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the fraudulent conduct detailed in the within Complaint.

## XV.   DEMAND FOR RELIEF

WHEREFORE, plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company respectfully pray that judgment enter in their favor as follows:

116

## COUNT I
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Lint Enterprise)
**Against MI Medical Management, LLC; Duramed MI, LLC; Supplies Plus MI, LLC; Diagnostic Chiropractic MI, P.C.; Excel Medical Group, PLC; AS Medical Group, PLC; and Robert Super, D.C.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT II
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Lint Enterprise)
**Against MI Medical Management, LLC; Duramed MI, LLC; Supplies Plus MI, LLC; Diagnostic Chiropractic MI, P.C.; Excel Medical Group, PLC; AS Medical Group, PLC; and Robert Super, D.C.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT III
## VIOLATION OF 18 U.S.C. § 1962(c)
### (MI Medical Enterprise)
**Against Lint Chiropractic PC; Diagnostic Chiropractic MI, P.C.; and Robert Super, D.C.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT IV
## VIOLATION OF 18 U.S.C. § 1962(d)
### (MI Medical Enterprise)
**Against Lint Chiropractic PC; Diagnostic Chiropractic MI, P.C.; and Robert Super, D.C.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT V
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Duramed Enterprise)
**Against Lint Chiropractic PC; Diagnostic Chiropractic MI, P.C.; and Robert Super, D.C.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VI
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Duramed Enterprise)
**Against Lint Chiropractic PC; Diagnostic Chiropractic MI, P.C.; and Robert Super, D.C.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VII
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Supplies Plus Enterprise)
### Against Lint Chiropractic PC; Diagnostic Chiropractic MI, P.C.; and Robert Super, D.C.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VIII
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Supplies Plus Enterprise)
### Against Lint Chiropractic PC; Diagnostic Chiropractic MI, P.C.; and Robert Super, D.C.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

### COUNT IX
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Diagnostic Chiropractic Enterprise)
### Against Lint Chiropractic PC and Robert Super, D.C.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

### COUNT X
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Diagnostic Chiropractic Enterprise)
### Against Lint Chiropractic PC and Robert Super, D.C.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XI
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Excel Enterprise)
### Against Lint Chiropractic PC; AS Medical Group, PLC; and Robert Super, D.C.

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT XII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Excel Enterprise)
### Against Lint Chiropractic PC; AS Medical Group, PLC; and Robert Super, D.C.

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT XIII
### VIOLATION OF 18 U.S.C. § 1962(c)
### (AS Medical Enterprise)
### Against Lint Chiropractic PC; Excel Medical Group, PLC; and Robert Super, D.C.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XIV
### VIOLATION OF 18 U.S.C. § 1962(d)
### (AS Medical Enterprise)
### Against Lint Chiropractic PC; Excel Medical Group, PLC; and Robert Super, D.C.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XV
## COMMON LAW FRAUD
### Against All Defendants

(a)     AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just.

## COUNT XVI
## CIVIL CONSPIRACY
### Against All Defendants

(a)     AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just.

## COUNT XVII
## PAYMENT UNDER MISTAKE OF FACT
### Against Lint Chiropractic PC; MI Medical Management, LLC; Duramed MI, LLC; Supplies Plus MI, LLC; Diagnostic Chiropractic MI, P.C.; Excel Medical Group, PLC; and AS Medical Group, PLC

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial; and

(b)     GRANT all other relief this Court deems just.

## COUNT XVIII
## UNJUST ENRICHMENT
### Against All Defendants

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial; and

(b)     GRANT all other relief this Court deems just.

## COUNT XIX
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against All Defendants

(a)     DECLARE that Allstate has no obligation to pay pending and previously-denied insurance claims submitted by Lint Chiropractic PC, MI Medical Management, LLC, Duramed MI, LLC, Supplies Plus MI, LLC, Diagnostic Chiropractic MI, P.C., Excel Medical Group, PLC, AS Medical Group, PLC and Robert Super, D.C., jointly and severally, for any or all of the reasons set out in the within Complaint;

(b)     DECLARE that Lint Chiropractic PC, MI Medical Management, LLC, Duramed MI, LLC, Supplies Plus MI, LLC, Diagnostic Chiropractic MI, P.C., Excel Medical Group, PLC, AS Medical Group, PLC and Robert Super, D.C., jointly and severally, cannot seek payment from Allstate pursuant to the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint;

(c)     DECLARE that Lint Chiropractic PC, MI Medical Management, LLC, Duramed MI, LLC, Supplies Plus MI, LLC, Diagnostic Chiropractic MI, P.C., Excel Medical Group, PLC, AS Medical Group, PLC, and Robert Super, D.C., jointly and severally, cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the fraudulent conduct detailed in the within Complaint; and

(d)     GRANT such other relief as this Court deems just and appropriate under Michigan and federal law and the principles of equity.

## XVI. <u>JURY DEMAND</u>

The plaintiffs hereby demand a trial by jury on all claims.

Respectfully submitted,

KTM

*/s/ Andrew H. DeNinno*

_____
Nathan A. Tilden (P76969)
ntilden@ktmpc.com
Andrew H. DeNinno
adeninno@ktmpc.com
Brad A. Compston
bcompston@ktmpc.com
38777 Six Mile Road, Suite 314
Livonia, MI 48152
(734) 521-9000

350 Granite Street, Suite 2204
Braintree, MA 02184
(617) 770-2214

Dated:  April 19, 2023                      *Attorneys for Allstate*